DECISION AND JUDGMENT ENTRY
{¶ 1} Defendant-appellant, Lamonte Hopings, appeals the March 31, 2005 judgment of the Lucas County Court of Common Pleas which, following a jury trial convicting appellant of murder, sentenced appellant to a term of 15 years to life in prison with an additional mandatory three year-term for the gun specification. For the reasons that follow, we affirm the trial court's decision.
 {¶ 2} On May 28, 2004, appellant was indicted on one count of aggravated murder, R.C. 2903.01(A), with a gun specification, for the May 19, 2004 shooting death of Robert Badgett. Appellant entered a not guilty plea.
 {¶ 3} On March 21, 2005, the jury trial in this matter commenced. A summary of the relevant testimony is as follows. The state presented evidence that on May 19, 2004, appellant and several family members were having a cookout at his mother's house, the bottom floor of a duplex, located at 3103 Parkwood Avenue in Toledo, Lucas County, Ohio. Appellant had been staying at the house. The individuals had congregated on the front porch/deck and were barbequing food. Around 4:00-5:00 p.m., the upstairs neighbor, Melissa Sutton, called 9-1-1 to report a break-in; she testified that while she was in her bedroom a group of boys broke open the locked door to the computer room. Sutton confronted them and they ran off. The police responded and took a report; they searched the neighborhood but could not find boys that matched Sutton's description.
 {¶ 4} During the above events, Sutton's son, fourteen year-old Rodshode Sutton, was playing basketball with and was later at the home of his uncle, Robert Badgett. Badgett lived directly around the corner with his wife, Monique Badgett. Rodshode testified that at around 7:30 p.m. he went home to check in with his mother; Rodshode then learned of the break-in.
 {¶ 5} Rodshode testified that the break-in made him "mad" and that he went downstairs to ask if anyone had seen the individuals running from upstairs; the group indicated negatively. According to Rodshode, as he was walking away he stated "somebody is going to get hit," but that he was not referring to the people downstairs. Rodshode then went back to his uncle's house.
 {¶ 6} After Rodshode left, Sutton testified that appellant, his brother, and his girlfriend came up and knocked on her door. Appellant stated that Rodshode "disrespected his mother." Sutton then went over to the Badgett's house to get Rodshode and have him apologize; Rodshode apologized and returned to the Badgett's.
 {¶ 7} Monique Badgett testified that when Rodshode returned he told her what had happened; Rodshode stated that he did not threaten appellant's mother. Robert Badgett overheard their conversation and told Rodshode that he was going to go and talk to Sutton. Monique stated that Robert was wearing a gray shirt and gray sweatpants when he left.
 {¶ 8} According to Rodshode, when Robert Badgett and Rodshode arrived at the Parkwood house, Badgett was stopped on the porch steps by appellant and his brother. Badgett told the men that Rodshode did not do anything wrong and that he should not have to apologize; an argument ensued. Rodshode testified that appellant's brother (Larry Hopings) "got in [his] uncle['s] face" and that his uncle then "pushed off of him." Rodshode stated that he lost track of appellant because he was watching Larry and his uncle.
 {¶ 9} Rodshode next noticed appellant when he came out of the house with a gun. Rodshode testified that some of the individuals present told appellant to put the gun down but that he shot Badgett. Prior to the shooting, Badgett was attempting to hide behind appellant's brother.
 {¶ 10} After Badgett was shot, Rodshode ran back to the Badgett house to tell his aunt. Rodshode testified that he never saw his uncle leave the Parkwood house and return.
 {¶ 11} Monique Badgett testified that after Rodshode told her that Robert had been shot she grabbed her cordless telephone and ran around the corner. She saw Robert lying on the ground and she telephoned 9-1-1. No one else was outside at this time. Monique testified that Robert did not come back to the house at any time during the altercation and that Robert did not have a weapon when he left the house. Monique admitted that she touched Robert's body but denied removing anything. Monique testified that she briefly left Robert to put on some clothes before the ambulance arrived; she had been in her pajamas.
 {¶ 12} Prior to the start of the altercation, Michael Lee, Melissa Sutton's live-in boyfriend, had come home from work. Lee stated that he observed Sutton making Rodshode apologize and then everything was "fine." Lee and Sutton went upstairs and Rodshode returned to the Badgett's.
 {¶ 13} A short time later, Lee heard Badgett's and Rodshode's voices coming from downstairs. Lee went down the enclosed, common stairway to listen to the conversation; he did not go out onto the porch. Lee observed Larry and Badgett "in each other's face" swearing and touching each other. Lee then observed appellant go inside the downstairs unit. Lee next saw appellant with a gun. According to Lee, Badgett tried to cover himself with Larry and "ease down the steps;" he was then shot.
 {¶ 14} Lee testified that he then saw Melissa Sutton screaming on the stairway; he picked her up and carried her upstairs. Sutton then called 9-1-1. Lee admitted that he had a prior felony conviction for aggravated drug trafficking.
 {¶ 15} At the time of the above events, James Scott, an off-duty Toledo Police Officer, was cutting the grass at his grandmother's house on Parkwood Avenue. Officer Scott heard a gun shot and he ran to the front of the house; he saw appellant with a shotgun. Scott said that appellant was "prancing" around Badgett's body. Officer Scott saw appellant run around the corner at Central Avenue; Scott did not pursue him because he did not have his service revolver. Scott testified that he got a cell phone from one of appellant's relatives and called 9-1-1.
 {¶ 16} Police responded to the scene; they were unable to locate appellant. In the basement of the home they found a Lakers sweat suit that matched a description of what appellant was wearing. They found what looked like fresh footprints. Most importantly, they found a pistol grip shotgun that matched the description of the weapon used in the shooting. The weapon was later tested and determined to be operable.
 {¶ 17} Next, the state requested that its witness, Toledo Police Officer Gerald Schriefer of the Scientific Investigation Unit ("SIU"), be qualified as an expert. Appellant's counsel objected to this testimony because Schriefer himself stated that he did not consider himself an "expert." Ultimately, Schriefer was allowed to give the following testimony. Officer Schriefer testified that he arrived at the shooting scene at approximately 9:00 p.m. Schriefer stated that based on his blood interpretation training and his experience, the blood and tissue matter found at the scene went from right to left in a downward trajectory; in other words, Schriefer stated that Badgett must have been two to three feet lower than appellant at the time of the shooting.
 {¶ 18} Officer Schriefer also testified regarding the footprints found at the scene. Schriefer testified that based solely on visual observation, the prints left in the blood by Badgett appeared to match the circular pattern of the prints in the basement. Schriefer was also present at Badgett's autopsy and took the photographs that were admitted into evidence.
 {¶ 19} Finally, Lucas County Deputy Coroner Dr. Cynthia Beisser testified that she conducted an autopsy on Badgett. Dr. Beisser testified that based on the amount of stippling (partially burned grains of gun power that cause burns) on appellant's face, she estimated that it was about three to four feet from the barrel of the gun to appellant's face. Dr. Beisser stated that the toxicology report showed a therapeutic level of Vicodin in his blood. Dr. Beisser testified that Badgett died from a gunshot wound to the head.
 {¶ 20} Appellant next presented the testimony of his cousin, Dawn Jennings, his uncle, Aberil Dotson, and his aunt, Sherrie Dotson. Appellant also testified. Dawn Jennings testified that she was on the bottom of the porch stairs when she heard Badgett say that if anyone "f d with his family somebody's mama would be wearing a black dress." Jennings stated that she got tired of the arguing and went into the house. Appellant came in the house and said that he was staying because Badgett left and said that he was coming back. Jennings testified that the arguing recommenced when Badgett returned. She testified that Badgett said that he was going to "shoot up the house" and kill everyone. Soon thereafter, Jennings heard a "pop" but did not see the shooting.
 {¶ 21} After the shooting, Jennings saw a woman come around from Central Avenue. Jennings stated that the woman was "feeling down [Badgett's] legs" and then she left. Jennings then went to her car to leave when a man, who identified himself as a police officer, asked to use her cell phone.
 {¶ 22} Aberil Dotson testified that he arrived at the end of the argument. Aberil saw Badgett push Larry. Aberil stated that Badgett had his hand up under his shirt and said that he was going to "pop up the house." Aberil said that he never saw appellant with a weapon or the actual shooting because his back was turned. Aberil testified that he saw a woman come up to Badgett's body, remove something, and go to the upstairs apartment.
 {¶ 23} Sherrie Dotson, a Lucas County Corrections Officer, testified that she was at her sister's home on Parkwood Avenue and heard Rodshode say that he was going to "smoke" the "M F's" for what they did to his mother's house. Sherrie said that Rodshode saw her and directed the comment to the people downstairs. Sherrie stated that Rodshode also said that there would be three women in black dresses and three women in a coffin.
 {¶ 24} Sherrie testified that when Badgett came to confront appellant he had on a large white tee shirt and stonewashed jeans. According to Sherrie, Badgett was threatening to shoot the people there and said that they chose the wrong house to burglarize. She stated that after multiple requests Badgett eventually left. The next time she saw him was after the shooting. Sherrie testified that a woman came up to his body and removed a package. She stated that the package was not large and looked like it was wrapped in a sandwich bag. Sherrie admitted that she never spoke with police to tell them about the threats that Badgett had been making.
 {¶ 25} Similarly, appellant testified that Badgett threatened that appellant's mother and the others would be wearing black dresses. Badgett left stating that he would be back. Appellant testified that when Badgett returned he was wearing a jogging outfit and that the hooded sweatshirt was pulled up over his head. Appellant stated that he went in the house to retrieve his weapon because he was afraid that appellant was returning to kill him and his family.
 {¶ 26} Appellant testified that he stood in the common doorway of the duplex pointing the shotgun and that he asked Badgett to leave. Appellant said that he fired a shot because Badgett had his head down and his hand up under his jacket like he was about to pull out a gun and shoot.
 {¶ 27} After shooting Badgett, appellant ran because he was scared and confused. Appellant turned himself in to the police a week later.
 {¶ 28} During rebuttal, Officer Schriefer testified that he did not receive a hooded sweatshirt with Badgett's other clothing. Schriefer stated that the clothing was already at the coroner's office when he arrived.
 {¶ 29} Following the presentation of testimony and exhibits, the jury found appellant guilty of murder with a gun specification. This appeal followed.
 {¶ 30} Appellant now raises the following four assignments of error:
 {¶ 31} "I. The trial court erred in failing to properly instruct the jury under Ohio law that one acting in self-defense possesses no duty to retreat from his home.
 {¶ 32} "II. The verdict is against the manifest weight of the evidence.
 {¶ 33} "III. The trial court erred in overruling appellant's objection to the discriminatory use of the prosecution's peremptory challenge.
 {¶ 34} "IV. It was error to allow Gerald Schriefer to testify as an expert witness."
 {¶ 35} In his first assignment of error, appellant disputes the trial court's refusal to properly instruct the jury that because appellant was in his home and acting in self-defense, he had no duty to retreat. A trial court is required to give the jury all instructions that are relevant and necessary for the jury to weigh the evidence and fulfill its duty as the factfinder. State v. Comen (1990), 50 Ohio St.3d 206,210. A court may refuse to give an instruction that is not applicable to the evidence in the case, or which is incorrect. State v. Cross (1979),58 Ohio St.2d 482, 488. A reviewing court will not reverse the trial court's decision relating to whether sufficient facts existed to support a jury instruction absent an abuse of discretion. State v. Endicott
(1994), 99 Ohio App.3d 688, 693.
 {¶ 36} In order to establish the affirmative defense of self-defense, appellant would have to have shown that he was not at fault in creating the situation; that he had a bona fide belief that he was in imminent danger of death or great bodily harm with his only means of escape being through the use of force; and that he did not violate a duty to retreat or avoid the danger. See State v. Thomas, 77 Ohio St.3d 323, 1997-Ohio-269.
 {¶ 37} While the court gave the self-defense jury instruction, the trial court denied appellant's request to include the "no duty to retreat" instruction based mainly on its conclusion that appellant was in a common area of the duplex rather than in the apartment. InState v. Frazier (Dec. 22, 1989), 6th Dist. No. L-89-017, a case relied on by the state, this court concluded that the appellant, who stabbed her ex-boyfriend in the hallway of an apartment building, had a duty to retreat into her apartment before using deadly force.
 {¶ 38} In his merit brief, appellant states that at the time of the shooting he was inside the front door of the house. Even assuming this that was true, inside the front door of the house was a common hallway which led to appellant's mother's apartment and to the upstairs apartment. Accordingly, as in Frazier, the trial court did not abuse its discretion when it refused to give the "no duty to retreat" instruction. Appellant's first assignment of error is not well-taken.
 {¶ 39} In his second assignment of error, appellant asserts that the jury's verdict was against the manifest weight of the evidence. In determining whether a verdict is against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "`* * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 40} Appellant contends that the weight of the evidence supports the finding that appellant acted in self-defense when he shot and killed Badgett. Particularly, and as set forth above, appellant relies on his testimony and the testimony of relatives to argue that Badgett repeatedly threatened to kill his family members and that appellant believed that Badgett returned to appellant's aunt's house to carry out the threats. Appellant also presented testimony that Monique Badgett removed something from her husband's body. Conversely, the state presented evidence that no weapon was found on Badgett and that Badgett was shot while he was further down on the steps and crouching behind appellant's brother.
 {¶ 41} Upon review of the evidence, we cannot say that the jury lost its way when it determined that the state's witnesses were more credible and convicted appellant of murder. Appellant's second assignment of error is not well-taken.
 {¶ 42} In his third assignment of error, appellant argues that the trial court erred when it denied his objection to the state's unconstitutional use of peremptory challenges to exclude two African Americans from the jury panel. The United States Supreme Court has held that the Equal Protection Clause forbids a prosecutor from challenging a prospective juror solely on the basis of his or her race based on the belief that the juror could not be impartial when the defendant is African American. Kentucky v. Batson (1986), 476 U.S. 79, 89,106 S.Ct. 1712, 90 L.Ed.2d 69. Batson has established a three-part test to determine whether a prosecutor's use of a peremptory challenge is racially motivated. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Id. at 82. Next, the burden shifts to the state to prove a race-neutral explanation for the challenge. Id. at 98. Finally, the trial court must determine whether the defendant has proven purposeful discrimination. Id.
 {¶ 43} In the present case, we find that the trial court did not err in finding that the state provided a race-neutral explanation for the two peremptory challenges at issue. First, prospective juror No. 2, an African American female, stated that her daughter, who was incarcerated, had been convicted in Lucas County of felonious assault using a box cutter. The juror indicated that the parties were intoxicated, "they exchanged a few words," and that her daughter "sliced her." This juror also has a son who was charged with drug trafficking.
 {¶ 44} With regard to prospective juror No. 2, the court concluded that the state's basis was race-neutral and based upon the juror's association with the court system. The court further noted that it would make a further inquiry if additional peremptory challenges were used.
 {¶ 45} The state's next peremptory challenge was exercised as to prospective juror No. 5, also an African American female, who replaced a juror that was excused. The prospective juror indicated that she and appellant "grew up together" and that appellant's aunt, Sherrie Dotson, and her mother were friends. The juror stated that she had not seen appellant since they were six or seven years old. The juror also indicated that she was a defendant in a criminal case involving a closed knife. The juror claimed self-defense but was convicted of "two misdemeanors and two disorderly conducts."
 {¶ 46} The court concluded that there was a race-neutral basis for the juror's exclusion due to the fact that she had been through the criminal process and, like appellant, had claimed self-defense. The court further noted that two African Americans were still on the jury.
 {¶ 47} After careful review of the voir dire, particularly the state's explanations for its peremptory challenges, we cannot say that the trial court erred in when it accepted the explanations and concluded that the challenges were race-neutral. Appellant's third assignment of error is not well-taken.
 {¶ 48} In appellant's fourth and final assignment of error, he argues that it was error for the trial court to allow Officer Gerald Schriefer to testify as an expert witness. In particular, appellant argues that Officer Schriefer was not qualified to testify about blood interpretation.[1] A trial court's determination of the qualifications of an expert witness to testify is within its sound discretion and will not be reversed absent an abuse of that discretion. State v. Awkal,76 Ohio St.3d 324, 331, 1996-Ohio-395; State v. Bidinost,71 Ohio St.3d 449, 453, 1994-Ohio-465. An abuse of discretion is more than an error of law or judgment, the term connotes an attitude by the court that is arbitrary, unreasonable, or unconscionable. State v. Adams (1980),62 Ohio St.2d 151, 157-158.
 {¶ 49} Regarding his qualifications, Officer Schriefer testified that he had been with the Toledo Police Department for 19 years; the SIU for 8 years. Officer Schriefer testified that he attended blood interpretation training for a "little bit over a week;" Schriefer also stated that he spent two weeks in general evidence training. Finally, Schriefer testified that at a crime scene his job is to recognize, collect, and preserve evidence. Finding Schriefer's testimony admissible, the court noted:
 {¶ 50} "He's rendering an opinion based on his observations, additionally as to the trajectory, and what he's referred to as blow back, and the blood, and the pattern of the blood. We find that sufficient evidence has been presented for his opinion to go to the jury. And they are also given an instruction relative to credibility of the witness and the weight to be given to it, even relating to experts."
 {¶ 51} Although Officer Schriefer stated that he did not consider himself an "expert," his testimony clearly demonstrated that he has specialized knowledge of blood interpretation. Further, Officer Schriefer's opinion was based upon his personal observations at the crime scene. See. Evid.R. 703. Moreover, we agree with the state that even assuming that the trial court erroneously permitted Officer Schriefer to testify as an expert, his testimony was admissible under Evid.R. 701.
 {¶ 52} Based on the foregoing, we find that the trial court did not abuse its discretion when it allowed Officer Schriefer's testimony. Appellant's fourth assignment of error is not well-taken.
 {¶ 53} On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, the fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Mark L. Pietrykowski, P.J., William J. Skow, J., George M. Glasser, J., CONCUR.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] Evid.R. 702 provides that "a witness may testify as an expert if all of the following apply:
"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
"(2) The design of the procedure, test, or experiment reliably implements the theory;
"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."