[Cite as *State v. Vasquez*, 2024-Ohio-860.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No.  L-22-1192

      Appellee                                  Trial Court No.  CR0201801191

v.

Devaun Vasquez                          **DECISION AND JUDGMENT**

      Appellant                                 Decided:  March 8, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio State Public Defender, and
Stephen P. Hardwick, Assistant State Public Defender, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Devaun Vasquez, appeals the July 12, 2018 judgment of the

Lucas County Court of Common Pleas sentencing him following his conviction of one

count of rape.  For the following reasons, we affirm.

## I. Background and Facts

{¶ 2} Vasquez was indicted on one count of rape in violation of R.C. 2907.02(A)(1)(c), a first-degree felony.

{¶ 3} Vasquez's case was tried to a jury beginning on June 19, 2018. As relevant to the issue in this appeal, the state presented the testimony of A.L., the victim; Jessica Ramsey, A.L.'s cousin; and detective Mark Nelson of the Toledo Police Department. The sexual assault nurse examiner ("SANE") who examined A.L., the police officer who showed her a photo array, the sheriff's deputy who downloaded Vasquez's jail phone calls, and two experts from the Ohio Bureau of Criminal Investigations ("BCI") also testified. Vasquez presented the testimony of Marcus Sandoval, his half-brother; Dylan Reed, Sandoval's friend and roommate; and Juan Roman, Sandoval's and A.L.'s friend.

{¶ 4} The charge against Vasquez stemmed from events that happened in the early morning hours of September 10, 2017, following a night out at a bar. Each of the witnesses presented a slightly different version of events.

### A. The state's case

### 1. A.L.'s testimony

{¶ 5} A.L. testified that she and some friends went out to a bar in downtown Toledo the night of September 9 because it was her last weekend in town before she left for boot camp. She remembered that she was with Roman, whom she had known since high school, and a friend whose name she forgot, but did not say if anyone else was in the

2.

group. The group got to the bar between 11:00 and 11:30 p.m. and left around 2:00 or 2:30 a.m. While they were there, A.L. had three or four mixed drinks.

{¶ 6} When A.L. left the bar, she went to an apartment on Graham Street with some friends. She described the layout of the very small apartment using photographs and a walk-through video. The front door opens into the living room. The kitchen is to the immediate right of the front door, and had a sheet covering the doorway. A very short hallway leads from the living room to the bathroom, which is at the far end of the apartment, directly opposite the front door. The apartment has two bedrooms, one to the right of the bathroom and one to the left. Although A.L. pointed out the bedroom "[w]here it happened" as she was watching the video, it is unclear from the record if she was referring to the bedroom to the right or left of the bathroom.

{¶ 7} That night, A.L. expected other friends to come to the apartment, but no one else showed up. Despite that, A.L. stayed at the house and fell asleep in the bedroom between 3:30 and 4:30 a.m.

{¶ 8} Around 5:30 a.m., A.L. was woken up by "some guy on top of [her] * * * [h]aving sex with [her]." She did not know the man assaulting her. During the assault, the man kept repeating "we've done this hundreds of times." When A.L. shined the light from her phone on the man's face, she realized that she did not know him and pushed him off of her. She stood up on the bed, and while the man was pulling up his pants, she ran out of the room. The man also kept repeating "you don't talk to me in my house like that,

3.

this is my house." A.L. did not see the man who assaulted her after she left the bedroom. However, she said that she heard the man leave the house.

{¶ 9} When she left the bedroom, A.L. was "freaking out," "crying," and "didn't know what was going on." She yelled for Roman, who walked out of the kitchen with Reed. She did not tell either man what happened. After that, she called Ramsey. She left the apartment about 30 minutes after she was assaulted. As she was leaving, she looked in the living room and saw Sandoval sleeping on the floor.

{¶ 10} Ramsey took A.L. to Ramsey's house. A.L. was reluctant to go to the hospital because she was leaving for boot camp nine days later and knew that she would not be able to go to boot camp if she went to the hospital. However, she eventually relented and went to the hospital at 6:00 or 6:30 a.m. At the hospital, a SANE conducted a sexual-assault examination. During the exam, the SANE had to bring Ramsey into the room to help A.L. calm down because she was "crying, [and] didn't want anyone to touch [her] * * *." She suffered low back and vaginal pain because of the assault.

{¶ 11} At the time of the assault, A.L. did not know her assailant's name, and had not met him before that night. She did, however, know that his nickname was "Dada" and found a Facebook profile with the name "Dada Blood" and a picture that matched her assailant. A.L. told Nelson about the Facebook page, and the SANE testified that A.L. identified her assailant by his Facebook name, "Dada Blood." Later, A.L. identified Vasquez in a photo array, and was sure that Vasquez was the man who raped her.

4.

{¶ 12} On cross-examination, A.L. clarified that she went out with Roman and his friends that night. She knew Reed, but did not know the others in their group. She also explained that Roman drove her to the bar; around 11:00 p.m., she drove to an address on Graham Street that Roman provided, left her car there, and rode to the bar with Roman. Although A.L. said there was "usually" a line to get into that bar, she did not say whether there was a line that night.

{¶ 13} A.L. admitted that, at 19 years old, she was too young to be in the bar and too young to drink. She asked Roman to get her drinks, which he did. She described herself as "intoxicated with alcohol" but not "drunk" after three or four mixed drinks.

{¶ 14} The first time she went into the Graham Street apartment was when they got back from the bar. She thought that Roman and Sandoval lived there, but was unsure if anyone else did. A.L. said that she, Roman, Reed, their friend Migel, Sandoval, Vasquez, and three women were at the apartment. People stayed for an hour or two, and A.L. went into a bedroom and fell asleep around the time people started leaving. Roman, Reed, Migel, and Sandoval were still at the apartment when she went to the bedroom. After she was assaulted, A.L. learned from Roman that he and Reed left to take Migel home, and returned to the apartment just before she came out of the bedroom.

{¶ 15} A.L. went to sleep wearing a t-shirt Roman gave her and the jeans she wore out that evening. When she woke, she was not wearing pants, so she assumed that the assailant removed them. She did not wake up until Vasquez's penis penetrated her

5.

vagina. She denied telling the SANE and police that she was "unsure" if penetration occurred. Although A.L.'s car was parked at the apartment, she "wasn't in a state of mind to drive [her]self * * *" after the assault, which is why she called Ramsey. Ramsey's boyfriend drove A.L.'s car back to Ramsey's house.

## 2. Ramsey's testimony

{¶ 16} Sometime between 4:00 a.m. and 6:00 a.m. on September 10, 2017, Ramsey received a phone call from A.L., who was crying to the point that Ramsey could not understand what she was saying. She told Ramsey that she had been raped. Ramsey also spoke to Roman during the call.

{¶ 17} Ramsey got to the apartment on Graham Street about five minutes after A.L. called, and was there for about ten minutes. Ramsey knew that Roman and Sandoval's girlfriend lived in the apartment. While she was there, Ramsey saw Roman, Reed, and Sandoval, but did not see Vasquez (she did not say whether she knew Vasquez). Roman was sitting on the bed with A.L. trying to comfort her, Reed brought Ramsey inside the apartment and stood talking to her, and Sandoval was on the living room floor watching TV. She said that the apartment was "[n]ot that big[,]" and she did not see Vasquez there. She also said that she "was told" that Vasquez "left right after it happened." Ramsey talked to Roman and Reed to try to find out what happened, but did not talk to Sandoval. She did not mention that her boyfriend came with her to the apartment or drove A.L.'s car back to Ramsey's house.

6.

**{¶ 18}** When Ramsey got to the apartment, A.L. "was just on the bed crying, freaking out. She really wasn't talking." When Ramsey tried to console her, A.L. moved away from Ramsey and did not want to be touched. Ramsey suggested that A.L. go to the hospital, which A.L. resisted at first because she did not want the incident to "delay her Navy career." Because A.L. was hesitant, Ramsey took her to see Ramsey's mother, who convinced A.L. to go to the hospital. Ramsey drove her to the hospital.

**{¶ 19}** At the hospital, A.L. spoke to detectives and had a rape exam. During the exam, A.L. seemed "scared" and did not seem to want people touching her.

**{¶ 20}** Ramsey did not call the police to report the rape, and did not know of anyone else calling the police before A.L. went to the hospital.

### 3. Detective Nelson's testimony

**{¶ 21}** Nelson was the detective assigned to A.L.'s case when the hospital reported the rape. When he spoke to A.L. at the hospital, the only thing she knew about her assailant was his Facebook name. Several days later, A.L.'s mother contacted Nelson to tell him that they had identified the man in the Facebook profile as Vasquez. He also heard from another detective who recognized the Facebook name and thought the profile might belong to Vasquez. Running Vasquez's name through police databases made Nelson confident that Vasquez was the suspect in this case, so he put together a photo array that included Vasquez's picture. Another officer, who did not know the details of the crime or which picture belonged to the potential suspect, showed the array to A.L.

7.

The officer who showed A.L. the photo array testified that she immediately identified the photo of Vasquez as her assailant.

{¶ 22} After A.L. identified Vasquez, Nelson tried to get in contact with him, but was unsuccessful. Specifically, Nelson said that he "did not have a direct phone number for * * *" Vasquez, but had "a couple different addresses that show[ed] as somewhat current, so [he] sent letters to those addresses for [Vasquez] to come to in [sic]." Vasquez did not show up for the interviews. Eventually, Nelson was able to get a DNA sample from Vasquez when he was arrested and jailed on an unrelated warrant. Vasquez's DNA sample and the evidence from A.L.'s sexual assault exam were sent to BCI for testing. BCI's testing of the vaginal swabs from the rape kit found a mixture of DNA that included one profile belonging to A.L. and one that was consistent with Vasquez's DNA.

{¶ 23} Roman, Sandoval, and Reed "refused" to speak with Nelson about the case. However, each man eventually provided a statement to the prosecutors that Nelson had access to. Based on those statements, Nelson believed that the rape happened "[e]xactly the way it was told by [A.L.] * * *."

### 4. Jail calls

{¶ 24} As part of its case, the state played recordings of two phone calls that Vasquez made from jail. In one call, Vasquez told the other party that the only way he could beat this charge was if "she" did not show up to court. He also told the other party

8.

to "drop some cashkowski off" to someone, and clarified that he meant "moolah," which the other person on the phone interpreted as "money." Regarding legal strategy, Vasquez said, "Basically my job is to make it consensual * * *." That is, he believed he would be found guilty because the state had his DNA and A.L.'s version of the story, so he thought the only way to succeed was to "make her a liar."

{¶ 25} In the second call, Vasquez lamented the fact that A.L. had testified in some court proceeding, and he predicted that she would show up for trial, which, he believed, diminished his chances of being found not guilty.

### B. Vasquez's case

### 1. Reed's testimony

{¶ 26} Reed was friends with Sandoval and Vasquez, and had known A.L. since high school. Reed lived at the Graham Street apartment on September 10, 2017. He was living with Sandoval; Sandoval and Vasquez's mother leased the apartment. Reed said that Vasquez did not live at the apartment, but "would come stay the night here and there." He also said that Roman "bunked rooms with [him] for a month[,]" but it was not clear if Roman was living there on September 10.

{¶ 27} The night of the assault, Reed said that he went to a bar in downtown Toledo with Roman and Sandoval. They left from the apartment in Roman's car. When they left, A.L. was not with the group and her car was not parked at the apartment. While the men were in line to get into the bar, A.L. joined them.

9.

{¶ 28} They were at the bar from around midnight to closing time. While they were there, A.L. asked Reed to buy her drinks "about * * * two times" and asked others to buy her drinks. Reed thought that Sandoval was the only one to buy her a drink, and he only saw her have one drink. At closing time, Reed left with Sandoval, Roman, and A.L. Reed did not think that A.L. was drunk when they left.

{¶ 29} When they got back to the apartment, Vasquez was there. So was Sandoval's girlfriend, who was sleeping in one of the bedrooms. Reed referred to it as "her room" and said that the girlfriend lived at the apartment. Reed did not see the girlfriend come out of the bedroom the rest of the night or see anyone but Sandoval go in. The rest of the people in the house—Reed said there were around seven—were in the living room drinking and dancing. While this was going on, Reed and Roman were in the kitchen cooking.

{¶ 30} Most of the guests left around 4:00 a.m. Reed recalled Migel, Roman, A.L., Sandoval, and Sandoval's girlfriend being in the house after the rest of the people "cleared out." Roman went to his room around 4:30 a.m. After that, Reed, Sandoval, Migel, and Vasquez were the only people left in the living room.

{¶ 31} Around the same time, Reed and Roman left the apartment to take Migel home. Reed estimated that they were gone for about 15 minutes and got back to the apartment around 4:45 a.m. When he and Roman got back, Sandoval was in the living room and both bedroom doors were closed. He did not see lights on in either bedroom.

10.

He and Roman went to the kitchen to start baking a cake, which is when A.L. "walked out of the bedroom and asked Marcus who Dada was." Reed said that he was confused by the question because he thought that A.L. knew Vasquez from talking to him earlier in the evening. At this point, A.L. looked "angry" and "mad." Soon after, Vasquez came out of the bedroom and asked "why she acting like that." He then went into the kitchen. Once Vasquez went into the kitchen, he was behind the curtain covering the doorway and was not visible from the living room. Reed reported that Vasquez "was just sitting there listening to us talk to her." Vasquez did not leave the apartment after hearing what A.L. said to Reed and Roman.

{¶ 32} When Ramsey came to the apartment to get A.L., she was alone. Reed said that A.L. looked "[n]ormal" when she left. He also said that A.L. did not have a car at the apartment that anyone needed to drive for her.

{¶ 33} On cross, Reed clarified the sequence of events. A.L. came out of the bedroom first and asked who "Dada" was. Vasquez was still in the bedroom at that point, but came out soon after and went into the kitchen. When Vasquez was out of the bedroom, A.L. went back in. Roman went in with her, and Reed "was called back in * * *" shortly after. While he was in the bedroom with A.L. and Roman, A.L. told them that she had been raped. After about 10 minutes, Roman called Ramsey for A.L.; Reed did not see A.L. talk to Ramsey during the phone call. During that time, A.L. was "acting

11.

different." When Ramsey arrived, Reed answered the door and led her to the bedroom where A.L. and Roman were. A.L. left with Ramsey.

{¶ 34} According to Reed, Vasquez was still in the apartment when A.L. left and came out of the kitchen when she was gone. He did not know if or when Vasquez left the apartment after that because he left after A.L. and Ramsey.

{¶ 35} Reed did not contact the police about the incident, and did not speak to them afterward. He did not initially talk to Vasquez's attorney about the case, either. Eventually, he gave a statement to the prosecutors and talked to defense counsel. Reed denied telling the prosecutors that they kicked Vasquez out of the apartment after A.L. accused him of raping her. Instead, he said they "kicked [Vasquez] out of the room. * * * I'm not sure if I said he left the apartment, but I know that he didn't leave the apartment."

{¶ 36} During a break after Reed's testimony, a court security officer saw Reed speaking to a group of people in the hallway. The officer did not hear everything he was saying, but caught him "explaining what questions were being asked." The officer could not provide specifics beyond saying that she "heard him say this is what they asked me * * *." The officer identified Sandoval and Roman as people who were in the group Reed was speaking to. Because Reed violated the court's witness-separation order, the court said it would allow the state "to let this transgression reflect upon the witness' credibility * * *" and would let the prosecutors "ask questions of the defense witnesses regarding

12.

this conversation and the content of the conversation that was had regarding Mr. Reed and his testimony."

**2. Sandoval's testimony**

{¶ 37} When Sandoval took the stand, Vasquez's attorney first asked him about the conversation he had with Reed in the hallway. Sandoval reported that Reed said he was "frustrated with the questions and how they approached him. * * * Because they were trying to reword—they were trying to trick him in to something he didn't do or say." Reed did not say what those questions were or how he answered them. He did, however, tell the group about the questions Vasquez's lawyer asked him. Sandoval agreed that counsel did not give him the questions in advance and only required that Sandoval "speak the truth."

{¶ 38} Regarding the night of the assault, Sandoval testified that he went to the bar with Reed, Roman, and Migel. He knew A.L. through Roman, and she was not in the car with them. They got to the bar sometime between 11:00 p.m. and midnight. A.L. did not meet up with the group until they were at the bar, and she was with a friend at the time. The group left at closing time, and A.L. rode back to the apartment with Sandoval, Reed, Roman, and Migel.

{¶ 39} When they got back to the apartment, the group listened to music and kept drinking. Sandoval recalled that another woman joined them at the apartment. Sandoval was in the living room the whole night. He thought that people began leaving around

13.

5:00 or 6:00 a.m.  He recalled that A.L. talked to Vasquez at the apartment.  At some point, A.L. and Roman went into the bedroom to the left of the bathroom.  Roman came out of the bedroom around 3:30 or 4:00 a.m. to drive Migel home.  Reed went with them.  When they left, Vasquez went into the bedroom where A.L. was.

{¶ 40} While A.L. and Vasquez were in the bedroom, Sandoval could hear them talking.  He could not tell what they were saying, but said it was "laughing, talking, just normal conversation."  He did not hear anything unusual, like screaming.  Vasquez came out to the living room to ask Sandoval for a condom, and went back to the bedroom after Sandoval said that he did not have one.  Sandoval noticed that a light was on in the bedroom when Vasquez came out to talk to him.  After Vasquez went back into the bedroom, Sandoval could hear him and A.L. talking again.

{¶ 41} Roman and Reed were gone for approximately 15 to 20 minutes.  When they got back, A.L. called Roman into the bedroom.  Sandoval first knew there was a problem when Roman came out of the bedroom and said that A.L. accused Vasquez of raping her.  Sandoval asked Vasquez if it was true, but he did not say how Vasquez responded.

{¶ 42} About 20 minutes later, Ramsey arrived to get A.L.  The only time Sandoval saw A.L. after she made the accusation was as she was walking out of the apartment with Ramsey.  Vasquez was sitting on the couch with him as A.L. was getting

14.

ready to leave, and Roman asked Vasquez to go into the kitchen, behind the curtain covering the doorway, so that A.L. would not see him.

{¶ 43} Sandoval did not contact the police about the incident, and did not speak to them afterward. He did not initially talk to Vasquez's attorney about the case, either. Eventually, he gave a statement to the prosecutors and talked to defense counsel.

{¶ 44} On cross, Sandoval explained that Vasquez is his half-brother; they share a mother. Their mother leased the Graham Street apartment. In September 2017, Sandoval and Reed lived in the apartment, Roman was staying with them at the time, and Vasquez would also stay there sometimes. They continued living together at the apartment after the incident.

{¶ 45} Sandoval also clarified some details from that night. He said that he smoked marijuana before leaving for the bar (but not after returning to the apartment), had two drinks at the bar, and was unsure how much he drank at the apartment.

{¶ 46} Regarding the layout of the apartment, Sandoval said that the couch he sat on was against the wall shared with the bedroom on the left side of the hall. The couch faced the front door, not the hallway and bedrooms. He was watching the TV, which was against the same wall as the front door. Despite facing away from the hallway, Sandoval remembered a light being on in the bedroom. He explained that there was a mirror in the hallway that reflected light into the living room when the bedroom door opened. The night of the assault, he only had a "small lamp * * * no overhead light" on in the living

room, and specifically remembered light reflecting into the room. He definitively testified that A.L. "was not asleep." He also explained that the pictures of the apartment were taken after he moved out, so the belongings in the pictures were not his and things were not necessarily in the same places they were on September 10, 2017.

{¶ 47} When Roman and Reed returned to the apartment, Vasquez came out of the bedroom. Sandoval said that A.L. did not leave the bedroom, and he did not see her until she left the apartment with Ramsey. He heard A.L. call for Roman, but did not remember her coming out to ask who the person in the room with her was.

{¶ 48} Sandoval and the others did not discuss the situation involving A.L. because "there wasn't no case pinned to [Vasquez] until he had got arrested" and A.L. "didn't call the police." To Sandoval, A.L.'s accusation against Vasquez was not, as the prosecutor put it, a "big event" because "[t]he way she reacted she didn't seem like she was raped, more like she got caught." Sandoval confirmed that he did not talk to police about the charges against Vasquez, and initially resisted speaking to prosecutors and Vasquez's attorney.

### 3. Roman's testimony

{¶ 49} In his testimony, Roman admitted that Reed talked to a group in the hallway after he testified, but said he did not talk about the specific questions he was asked. According to Roman, "All [Reed] said was that they were just trying to switch up

16.

the story." Roman agreed that Vasquez's attorney did not give him questions in advance and only required that Reed "[t]ell the truth."

{¶ 50} On September 10, 2017, Roman was living with his parents. Sometime before that, he had lived at the Graham Street apartment for about a month, but had moved back home by September 10. He said that the apartment was "Marcus' house." Before the night of the assault, Roman had taken A.L., whom he had known since high school, to the Graham Street apartment about three times.

{¶ 51} Before the group went to the bar that night, Roman was at the apartment with Reed, Sandoval, and Migel. A.L. was not at the apartment and did not leave her car there. The men went to the bar around 11:00 or 11:30 p.m. While they were waiting to get in, A.L. saw them and joined them in line. Once inside, Roman went upstairs and sat at a table. Someone bought him a beer, which was all he had to drink. A.L. asked Roman to buy her a drink, but he refused. The group stayed at the bar until closing time, around 2:00 or 2:30 a.m. When they left, Roman drove A.L., Reed, Sandoval, and Migel back to the apartment. A.L. came with them because her ride left without her and she asked to go with them.

{¶ 52} When they got back to the apartment, Migel's girlfriend was there. Roman did not say if Vasquez was at the apartment when they came back from the bar or if he came later. At the apartment, the group listened to music, danced, and drank. Roman left the living room at one point to get food from the kitchen, and later went into Reed's

17.

bedroom with A.L. He said that Vasquez was "socializing with everybody" the whole time, and stayed in the living room with Sandoval and Reed when Roman and A.L. went to the bedroom.

{¶ 53} Later, Roman left to take Migel home. A.L. was awake when he left. He was gone for 15 to 20 minutes. When he got back, he went into the kitchen to bake a cake. While in the kitchen, Roman heard A.L. come out of the bedroom and ask Sandoval something along the lines of "[w]ho was in the room with her * * *." Roman said that A.L. was "calm" when he and Reed stepped out of the kitchen while she was talking to Sandoval, but when she saw Roman, she "looked upset or something like that * * *." When he "went to see what was going on, * * *" A.L. said "[t]hat he raped her or whatever * * *." A.L. was standing right outside of the kitchen door when Roman talked to her. He saw Vasquez come out of the bedroom to the left of the bathroom and stand in the hall near the bedroom and bathroom doors. According to Roman, he "told [Vasquez] he has to go, and then [he] pushed [A.L.] in to the room to see what was going on and talk to her." Vasquez tried to talk to Roman, but Roman "just told him just to go because * * * [Roman] was confused on what was going on, so [he] just told [Vasquez] to go * * *." He did not know if Vasquez left the apartment; he only knew that Vasquez left the bedroom area.

{¶ 54} Roman spoke to A.L. in the bedroom. While they were in there, A.L. called Ramsey. During the call, Roman took the phone from A.L. and told Ramsey to

come pick up A.L. because "she's saying she got raped * * *." Roman remembered Ramsey coming to get A.L. because A.L.'s car was not at the apartment. He could not remember what time Ramsey got there, but thought it was about 15 minutes after he "separated" A.L. and Vasquez.

{¶ 55} Roman did not call the police about the situation because he "didn't know what to do" and felt "[c]onfused, lost, just a lot was just running through [his] head because [he] didn't know what went down, so [he] didn't know * * * what to think." No one else at the apartment called the police, either. Roman also testified that he did not speak with law enforcement about this case. However, he talked to the prosecutors after they called his dad, who told him to meet with them. He also spoke to Vasquez's lawyer a "long time" after counsel started trying to contact him. He said that his testimony was the same as the statement he gave the prosecutors.

{¶ 56} On cross, Roman said that Reed "talked about what you guys were trying to do, that's it" when he addressed the group in the hall. He did not hear Reed talking about specific questions that Vasquez's lawyer asked.

{¶ 57} Regarding the events of September 10, Roman confirmed that he was not living at the Graham Street apartment at the time; Reed, Sandoval, and Sandoval's girlfriend were the only residents.

{¶ 58} When the group was back at the apartment after leaving the bar, Roman saw A.L. and Vasquez talking, but did not know how long their conversation was

19.

because he "[w]asn't really paying attention." He was unsure when people started to leave because he and A.L. were in the bedroom. Roman clarified that Reed was with him when he left to take Migel home. When the three men left, Vasquez and Sandoval were in the living room and A.L. was in the bedroom. Roman was not sure who was in the living room when he got back because he went straight into the kitchen. He and Reed were in the kitchen for two or three minutes before A.L. came out of the bedroom and asked Sandoval who the person in the bedroom was. Roman could not remember if Sandoval responded. A.L. did not ask Roman who the man was. When Roman came out of the kitchen, A.L.'s "demeanor changed" and she said that she had been raped. He said that A.L. made this statement when she was back in the bedroom with him. When Roman took A.L. back to the bedroom, he saw Vasquez "getting dressed or whatever."

{¶ 59} In the bedroom, A.L. called Ramsey. During the call, Roman got on the phone to tell Ramsey to "come over and get [A.L.] because she says she's been raped." He "grabbed" A.L.'s phone from her while she was talking to Ramsey to "tell [Ramsey] to come over because she's talking on the phone too long." He wanted Ramsey to "hurry up and get there, not sit there and prolong the situation." When Ramsey arrived, she went directly to the bedroom to get A.L.

{¶ 60} Roman did not talk to Vasquez after A.L. accused him of rape. He "told [Vasquez] to go[,]" but did not say that he kicked Vasquez out of the apartment.

20.

{¶ 61} Although he was close friends with Sandoval and Reed, Roman claimed that he had not discussed the events of September 10 with them. He said that he "didn't want anything to do with what happened because [he] didn't know what was going on" and "[i]t's not something you just talk about openly." At first, Reed did not visit the Graham Street apartment because he "didn't want anything to do with what was going on. [He] didn't know what was going on[,]" but he eventually started going to the apartment again. While the case was pending, Vasquez's mother messaged Roman on Facebook telling him to talk to Vasquez's lawyer. Roman's mother saw the message and "felt like it was a threat, but [Roman] didn't feel threatened by it * * *" because he knows Vasquez's mother.

{¶ 62} Roman admitted that he only spoke to the prosecutors after being subpoenaed and being told by his dad to talk to them. He did not remember police trying to contact him about the incident, but said that they contacted his dad. He did not voluntarily come forward because he "didn't want nothing to do with it." He did not speak to Vasquez's attorney until after he had spoken to the prosecutors.

### C. Jury instructions

{¶ 63} Before trial, the state asked for a jury instruction on consciousness of guilt based on Vasquez fleeing the scene. After the state rested, while discussing the jury instructions with the attorneys, the trial court noted that a "[f]oundation has been laid that [whether Vasquez fled] is a fact in dispute here today." Vasquez's attorney objected to

21.

the instruction because the state presented "very little" testimony regarding flight and none of the state's witnesses "was in a position to know if [Vasquez] was there or not." He believed that a flight instruction would "somewhat put[] the defendant in a position where the jury is instructed on an issue that the state may have not even proven and they may not have shown." He conceded that "it's a question as to what the jury will believe." The state responded that Ramsey, who arrived within about ten minutes of A.L.'s phone call, did not see Vasquez at the apartment, and A.L. testified that she heard Vasquez leave, which the state believed was sufficient to warrant a flight instruction. The trial court pointed out that Vasquez's arguments went to the weight and credibility of the evidence, which counsel could argue to the jury, but that "sufficient foundation and testimony has been laid * * *" to support a consciousness-of-guilt instruction.

{¶ 64} When it instructed the jury, the trial court gave the following consciousness-of-guilt instruction:

Testimony has been admitted indicating that the defendant fled the residence [on] Graham Street * * *. You are instructed that the defendant's fleeing the scene alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt. If you find that the facts do not support that the defendant fled [the residence], or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not

22.

consider this evidence for any purpose.  However, if you find that the facts support the defendant engaged in such conduct and if you decide that the defendant was motivated by a consciousness of guilt, you may, but are not required to consider that evidence in deciding whether the defendant is guilty of the crime charged.  You alone will determine what weight, if any, to give this evidence.

## D. Outcome and appeal

{¶ 65} Following its deliberations, the jury found Vasquez guilty of rape.  The trial court sentenced him to a mandatory 8 years in prison.

{¶ 66} Vasquez now appeals, raising one assignment of error:

> The trial court erred by instructing the jury that evidence showed that Mr. Vasquez "fled" the house when there was only evidence that he left the living room and went to the kitchen, and that he left the house entirely sometime before A.L. did.

## II. Law and Analysis

{¶ 67} In his assignment of error, Vasquez argues that the trial court erred by including an instruction on consciousness of guilt in its charge to the jury.  He contends that the facts presented at trial, when viewed in the light most favorable to the state, did not support a finding that he "fled" from the apartment.  He also argues that the error was prejudicial because the state relied on his flight from the scene in its closing argument,

23.

and he "was one of only two people in the room where A.L. says the crime occurred, and because he had the right not to testify, the adverse inference from the jury instruction was prejudicial."

{¶ 68} In response, the state contends that it presented "enough evidence to at least establish a foundation of flight[,]" so the trial court's instruction on consciousness of guilt was not an abuse of discretion. It also argues that Vasquez was not prejudiced by the instruction because the instruction gave the jury the option to "consider the State's evidence of flight as being motivated by guilt, but * * * they were not required to consider this evidence at all."

{¶ 69} Trial courts are charged with giving juries "complete and accurate" instructions that adequately reflect the issues argued in the case before them. *State v. Sneed,* 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992). "Requested jury instructions should ordinarily be given if they are correct statements of law that are applicable to the facts in the case, and reasonable minds might reach the conclusion sought by the instruction." *Miller v. Defiance Regional Med. Ctr.,* 6th Dist. Lucas No. L-06-1111, 2007-Ohio-7101, ¶ 40, citing *Murphy v. Carrollton Mfg. Co.,* 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991). We review a trial court's determination that sufficient facts exist to support a jury instruction for an abuse of discretion. *State v. Hopings*, 6th Dist. Lucas No. L-05-1145, 2007-Ohio-450, ¶ 35. In doing so, we review the instructions as a whole to determine whether or not the jury was likely misled in a matter materially affecting the

24.

substantial rights of the party who claims error. *Miller* at ¶ 40, citing *Becker v. Lake Cty. Mem. Hosp. West,* 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990).

{¶ 70} Evidence of flight is admissible to show a defendant's consciousness of guilt. *State v. Williams,* 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997). "Flight means some escape or affirmative attempt to avoid apprehension." (Internal quotation omitted.) *State v. Herrell,* 6th Dist. Lucas No. L-16-1173, 2017-Ohio-7109, ¶ 24, citing *State v. Wesley,* 8th Dist. Cuyahoga No. 80684, 2002-Ohio-4429, ¶ 19; and *United States v. Felix-Gutierrez,* 940 F.2d 1200, 1207 (9th Cir.1991). To constitute "flight," the defendant must "appreciate that he has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found." *State v. Sanchez-Sanchez,* 2022-Ohio-4080, 201 N.E.3d 323, ¶ 177 (8th Dist.), *appeal not allowed*, 169 Ohio St.3d 1458, 2023-Ohio-758, 204 N.E.3d 569. Under such circumstances, the jury could infer that the defendant "'is avoiding the police only because he or she knows he or she is guilty and wishes to avoid the inevitable consequences of his or her crime.'" *State v. Hennigan*, 11th Dist. Lake No. 2023-L-058, 2024-Ohio-404, ¶ 50, quoting *State v. James*, 11th Dist. Trumbull No. 2022-T-0107, 2023-Ohio-3524, ¶ 62. But, "[f]light is more than merely leaving the scene of the crime * * *" because it is "unrealistic to expect persons who commit crimes to remain on the scene for ready apprehension." *Sanchez-Sanchez* at ¶ 185, citing *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30; *State v. Walter*, 2d Dist. Montgomery No. 29614, 2023-Ohio-2700, ¶ 100,

quoting *State v. Cargle*, 2d Dist. Montgomery No. 28044, 2019-Ohio-1544, ¶ 48 ("[T]o constitute flight, 'it must be clear that the defendant took affirmative steps to avoid detection and apprehension beyond simply not remaining at the scene of the crime.'").

{¶ 71} In this case, although there was conflicting testimony regarding what happened after A.L. emerged from the bedroom—including whether and when Vasquez left the house—A.L. testified that she heard Vasquez leave the house at some point after she left the bedroom "freaking out" and "crying."   Given A.L.'s testimony, there was sufficient evidence presented at trial that—if believed—could lead a reasonable juror to conclude that Vasquez left the apartment shortly after the crime.  *See State v. Robinson*, 10th Dist. Franklin No. 17AP-853, 2019-Ohio-558, ¶ 31, citing *State v. White*, 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 48 (2d Dist.); and *State v. Wood*, 2d Dist. Clark No. 2010 CA 42, 2011-Ohio-2314, ¶ 30 (flight evidence used to support an inference of guilt should generally be limited to situations where the defendant's flight activities happen at a time and place near the criminal activity the defendant is fleeing).

{¶ 72} But, for a flight instruction to be warranted by the facts, there must be evidence that Vasquez did *more than* leave the scene—i.e., there must be evidence that he knew he was implicated in a crime *and* took steps to avoid detection or the consequences of his actions *beyond* not remaining at the apartment.

{¶ 73} None of the testimony indicated that Vasquez left the apartment as a way of preventing the police from finding him in the immediate aftermath of the assault.  Each

26.

witness who was in the apartment that night said that they did not contact the police, so there was no immediate threat of officers coming to the apartment that could have prompted Vasquez to leave.  *See State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 29 (consciousness-of-guilt instruction based on flight was improper because defendant "had no reason to believe that the police were actively seeking him" when he left the crime scene); *compare State v. Johnson*, 6th Dist. Lucas No. L-03-1206, 2005-Ohio-1222, ¶ 16-17 (flight instruction was proper where there was evidence that defendant shot someone in his girlfriend's house and left the house when his girlfriend said she was going to call the police).

{¶ 74} But Nelson testified that he asked Vasquez "to come to in [sic]" by sending letters to "a couple different addresses that show[ed] as somewhat current, * * *" and Vasquez "did not show up for any of those interviews."  Nelson sent the letters because he did not have a phone number for Vasquez.

{¶ 75} Although this evidence is rather thin—especially since it is not clear what information the letters contained, how "current" these addresses were, or how the addresses were connected to Vasquez—this testimony, if believed, would be sufficient for the jury to conclude that Vasquez knew the police were looking for him.  This evidence, when combined with the testimony regarding the events that unfolded after A.L. emerged from the bedroom—from which the jury could have concluded that Vasquez knew that A.L. had accused him of rape, and left the scene immediately

27.

thereafter—is circumstantial evidence that Vasquez knew that he was wanted by the police and avoided talking to them.

{¶ 76} In sum, this was truly a matter of evidentiary *weight* for the jury—the evidence was there for the jury to believe, or disbelieve, as it saw fit. For this reason, the trial court's decision to issue a flight instruction was not unreasonable, arbitrary, or unconscionable. *See State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 105 (flight instruction was proper when defendant avoided officers' attempts to talk to him despite receiving phone calls from officers and his family members telling him that police wanted to talk to him); *compare Sanchez-Sanchez*, 2022-Ohio-4080, 201 N.E.3d 323, at ¶ 183 (it was not clear defendant knew he was wanted by police and took affirmative steps to avoid apprehension—so flight instruction was not supported by the evidence—when (1) defendant left Ohio months after committing the crime; (2) defendant left a month after seeing victim's parents at immigration office (and a month after parents first reported defendant to police), but before police tried to arrest him; (3) defendant did not take steps to conceal his destination or whereabouts; (4) detective testified that officers tried to arrest defendant at what they "believed" was his home and they "believed" people were in the home, but did not answer the door; and (5) defendant did not resist arrest when he was found).

{¶ 77} Although the trial court did not abuse its discretion by giving the flight instruction, the wording of the instruction is problematic. While a trial court has broad

28.

discretion to fashion jury instructions, it is still required to "give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." (Internal quotations omitted.) *State v. Heiney*, 2018-Ohio-3408, 117 N.E.3d 1034, ¶ 133 (6th Dist.), citing *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46; and *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus.

**{¶ 78}** In this case, the court used an instruction that is nearly identical to the pattern consciousness-of-guilt instruction in *Ohio Jury Instructions*, CR Section 409.13 (Rev. Aug. 17, 2005). That instruction suggests an array of conduct that could show a defendant's consciousness of guilt, and allows the trial court to choose the appropriate option or options based on the evidence produced at trial. Specifically, it states:

> Testimony has been admitted indicating that the defendant (fled the [scene] [*describe jurisdiction*]) (escaped from custody) (resisted arrest) (falsified his/her identity) (changed appearance) (intimidated a witness) (attempted to conceal a crime) (*describe other conduct*). You are instructed that (*describe defendant's conduct*) alone does not raise a presumption of guilt, but it may tend to indicate the defendant's (consciousness) (awareness) of guilt.

(Brackets and italics sic.) *Id.* Consistent with one of the options in the *OJI* instruction, the trial court used "fled the residence * * *" and "fleeing the scene * * *" to describe

29.

Vasquez's conduct. But in some cases—like this one—"fled the scene" does not adequately describe the behavior that the jury can consider when determining whether the defendant was motivated by a consciousness of guilt. *See Walter*, 2d Dist. Montgomery No. 29614, 2023-Ohio-2700, at ¶ 100 (based on the evidence, the jury reasonably could have interpreted an instruction that defendant "fled the scene" to include defendant's mere absence from the scene); *Sanchez-Sanchez* at ¶ 185-186 ("If a trial court is going to use the pattern jury instruction, it still must tailor the instruction to accurately apply to the evidence presented."); *State v. Burchfield*, 66 Ohio St.3d 261, 263, 611 N.E.2d 819 (1993) ("While OJI is widely used in this state, its language should not be blindly applied in all cases.").

{¶ 79} For example, in *Walter*, the defendant murdered his mother in the home they shared. The trial court gave a consciousness-of-guilt instruction that said Walter "fled the scene." *Walter* at ¶ 99. The Second District found that a consciousness-of-guilt instruction based on flight was proper because Walter left the house and took steps to avoid detection after the murder, including washing his hands, changing his shirt, and telling his mother's sister that he had gone to Georgia. *Id.* at ¶ 98. Nevertheless, the Second District determined that the trial court's instruction was potentially misleading because neither Walter, who lived where the murder was committed, nor his mother's car, which Walter was sitting in when he was arrested, was at the house when the body was discovered, and "the jury could have reasonably interpreted the trial court's

30.

instruction to mean that Walter's absence from the home constituted 'fleeing the scene'"—despite "a person's mere departure from the scene of a crime * * *" not constituting flight. *Id.* at ¶ 100.

{¶ 80} We have a similar situation here. The trial court told the jury that there was testimony that Vasquez "fled the residence [on] Graham Street, * * *" and referred to Vasquez "fleeing the scene * * *." In this particular case, we find that the instruction was potentially misleading because the jury reasonably could have concluded that Vasquez "fled the scene" based only on his departure from the apartment. To ensure that the jury instructions were "complete and accurate," *Sneed,* 63 Ohio St.3d at 9, 584 N.E.2d 1160, a more robust instruction was required. *See State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 72 (the "generic nature" of a limiting instruction regarding the proper use of other-acts evidence under Evid.R. 404(B), which followed the pattern instruction in *OJI* and was not customized to the facts of the case, "severely reduced" the instruction's effectiveness).

{¶ 81} In this case, the court chose to characterize Vasquez's conduct as "flight." However, given the evidence presented, it should have included a more detailed and complete instruction explaining the affirmative conduct necessary to establish "flight"— i.e., the specific actions Vasquez took to avoid detection, apprehension, or consequences—and that fleeing required more than merely leaving the apartment (the place where the crime happened). Had the court done so, it would have tailored the

31.

pattern instruction to fit the facts presented to the jury and made it specific enough to avoid potentially misleading the jury.

{¶ 82} Regardless, we find that the error was harmless. A flight instruction that tells the jury (1) any consciousness-of-guilt finding is "entirely permissive," (2) the instruction only applies if the jury finds that the defendant fled due to his consciousness of guilt, (3) the jury has discretion to give consciousness-of-guilt evidence no weight, and (4) fleeing does not create a presumption of guilt is "neutral in its effect" and "'all but innocuous.'" *State v. Aekins*, 2023-Ohio-322, 207 N.E.3d 934, ¶ 119 (10th Dist.); *Walter* at ¶ 101, quoting *White*, 2015-Ohio-3512, 37 N.E.3d 1271, at ¶ 51. This is because such an instruction explains the limited use of flight evidence, instructs the jury to consider flight only if it finds that consciousness of guilt was the defendant's motive, and allows the jury to disregard flight evidence entirely. *White* at ¶ 51. The flight instruction in this case was properly neutral, so it was "all but innocuous" and not prejudicial. *Id.*; *compare State v. Orians*, 179 Ohio App.3d 701, 2008-Ohio-6185, 903 N.E.2d 656, ¶ 12-15 (3d Dist.) (trial court's use of a consciousness-of-guilt instruction that was not neutral was prejudicial).

{¶ 83} Moreover, we cannot say that the outcome of the trial would have been different if the trial court did not give the flight instruction. Vasquez argues that he was prejudiced by the "adverse inference" the flight instruction created because he and A.L. are the only two people who know what happened in the bedroom that night, and the

32.

instruction "goes directly to whether Mr. Vasquez believed he had acted appropriately or inappropriately." This was not the only evidence of Vasquez's consciousness of guilt, however. The state played a jail call in which Vasquez told the other party to bribe a person—presumably A.L.—whose testimony he thought was enough to convict him. Evidence of a defendant attempting to bribe a witness shows consciousness of guilt and is sufficient to support a consciousness-of-guilt instruction. *State v. Jones*, 6th Dist. Erie No. E-19-065, 2021-Ohio-2621, ¶ 62, citing *State v. Leu*, 2019-Ohio-3404, 142 N.E.3d 164, ¶ 39 (6th Dist.). So, although the wording of the consciousness-of-guilt instruction based on flight was potentially misleading, Vasquez's alleged flight from the apartment was not the only evidence before the jury that went "directly to whether Mr. Vasquez believed he had acted appropriately or inappropriately."

**{¶ 84}** Additionally, Vasquez said on the first jail call that he needed to "make [A.L.] a liar[,]" and Reed, Sandoval, and Roman—the other witnesses who had some direct knowledge of the events on September 10—initially refused to discuss the case with law enforcement, prosecutors, or defense counsel, and discussed their testimony in defiance of the court's separation order, which could have affected their credibility with the jury. So, although Vasquez does not challenge the sufficiency of the evidence or argue that his conviction is against the manifest weight of the evidence, the record shows that his conviction was well-supported by evidence beyond his alleged flight.

33.

{¶ 85} In sum, after reviewing the jury instructions as a whole and considering them in the context of the trial, we cannot say that the trial court's instruction on flight affected Vasquez's substantial rights, and the instruction was harmless beyond a reasonable doubt. Therefore, Vasquez's assignment of error is not well-taken.

### III. Conclusion

{¶ 86} For the foregoing reasons, the July 12, 2018 judgment of the Lucas County Court of Common Pleas is affirmed. Vasquez is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                        _____
                                                                    JUDGE
Christine E. Mayle, J.

Myron C. Duhart, J.                         _____
CONCUR.                                                       JUDGE

                                                          _____
                                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.