[Cite as *State v. Greene*, 2025-Ohio-1096.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                      Court of Appeals No.  WD-23-056

    Appellee                                Trial Court No. 2021 CR 0066

v.

Linda A. Greene                          **<u>DECISION AND JUDGMENT</u>**

    Appellant                               Decided: March 28, 2025

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, for appellant.

Laurel A. Kendall, for appellee.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} This matter is before the court on appeal of appellant, Linda A. Greene, following her conviction for tampering with records, theft, solicitation fraud, and prohibited acts and practices for charities, for which the trial court imposed a three-year, aggregate prison term. Based on the following, we affirm.

## II. Facts and Procedural History

{¶ 2} This case is primarily a documents case. The testimony presented at trial focused almost entirely on financial records, with expert testimony that identified transactions underlying the criminal charges. We base our overview of the case on these records and the trial testimony.

{¶ 3} This matter arose from complaints related to the use of charitable donations to the private charity, ISOH/Impact with Hope ("the charity"). Greene initially worked for the charity, which was founded by her parents in 1970, and her late husband managed operations until his death in 2007. Greene served as president and CEO of the charity for the period at issue, from 2011 through 2018.

### A. The Charity's Mission and the Hope Center Project

{¶ 4} The charity's primary purpose was to provide aid after a natural disaster, nationally and internationally, and to assist children in medical need by facilitating medical treatments. The charity had a network of medical professionals that made mission trips to provide care, and Greene and her late husband both worked in the medical field and participated in this work. The charity also owned properties to further its mission. The charity collected donated goods in its warehouse in Waterville, Ohio, and with a team of volunteers, packaged and shipped supplies to areas in need. In the 2000s, the Stranahan Foundation donated funds to purchase a residence on River Road, in Perrysburg, Ohio, which the charity used to house office space, as an event center and meeting place, and to board children and their families during medical treatments in the area. In 2007, the charity

2.

received a parcel of unimproved land near Levis Commons as a donation, which the charity planned to use to construct a new warehouse and office called the Hope Center.

{¶ 5} In late 2010, Greene sought approval for proposed building plans for the Hope Center from the Perrysburg Planning and Zoning Division, a preliminary step before seeking a zoning permit. Greene attended the meeting with building/construction professionals, who volunteered their assistance for the project. Based on the deficiencies in Greene's plan for construction, the meeting was deemed premature, as the commission found the details and scope of the project not fully articulated. Greene's volunteers expressed frustration and an intent to withdraw from the project, because the necessary work to move forward exceeded the scope of volunteer efforts. The Planning and Zoning Division issued a memo in 2011, acknowledging the formal submission of the Hope Center plans and detailing the deficiencies in those plans in writing. Greene did not follow up with revised plans after receiving the 2011 memo and had no further contact with the Planning and Zoning Division until 2013.

{¶ 6} In 2013, Greene requested a status update from the Planning and Zoning Division. Greene had not submitted additional documentation or modified plans prior to or with this request, and the Division's response consisted of a summary of the deficiencies communicated in 2010-2011. Aside from requesting an update, Greene took no other steps to initiate the project. Greene did not present amended construction plans and did not apply for any of the permits necessary for construction of the Hope Center.

3.

{¶ 7} While the plans for the Hope Center stalled, Greene nevertheless moved forward with fundraising for the project. In February 2013, Greene hosted a charity gala to raise funds for the construction of the Hope Center. The event was publicized as a benefit to build the new facility, and immediately following the gala, $27,500 was deposited into the charity's money market account at Key Bank. Additional funds were raised in the following weeks, and by April 2013, just over $71,000 was held in the money market account. A year and a half later, the money market account was mostly depleted, with funds either moved into the charity's general fund or another fund and used for various expenses unrelated to construction of the Hope Center. By 2019-2020, all the funds raised for the Hope Center were spent and the charity never broke ground on the project.

### B. Greene's Management of the Charity

{¶ 8} Throughout the period at issue, Greene assumed the additional duties of bookkeeper after the charity's long-time bookkeeper departed. Therefore, Greene had sole control over the charity's day-to-day financial activities and was the sole person in charge of record-keeping. However, Greene's record-keeping was disorganized and incomplete, and she moved funds from one account to another without documentation and claimed reimbursement from the charity for large amounts, with expense reports completed and retained for only a fraction of the funds reimbursed. Greene was the signatory on all the charity's bank and credit card accounts, and the charity's board of directors had granted Greene full authority over expenditures up to $10,000.00, with larger expenses approved by the board with little inquiry.

4.

{¶ 9} As president, CEO, and bookkeeper, Greene also managed the donations, tasked with soliciting funds, materials, and services from individuals, corporations, medical providers, and foundations. In addition to soliciting specialized services for medical missions and local treatment, the charity had volunteers to package and prepare shipments sent as aid to communities in need. The charity maintained a web presence to solicit aid, with the web page providing options to direct monetary donations to specific causes. However, the web site was not designed to segregate funds, and Greene did not maintain records for separate funds. Almost all donated funds were deposited in the charity's general account, or the account used for everyday expenses for operating the charity.

{¶ 10} An outside accountant, Don King, prepared the charity's annual audits and tax filings based on the information Greene supplied. King's information was incomplete, however, as Greene did not disclose all the charity's bank accounts to King. Greene, furthermore, did not inform King of the charity's six different American Express accounts. In total, King was aware of four of the charity's accounts, with Greene omitting the remainder of the charity's 13 accounts in her disclosers for the audits and tax filings. King knew that Greene lived at the charity's River Road property, but was unaware of Greene's use of charity funds or her practice of writing reimbursement checks to herself. King's audits and filings, therefore, were reports based on selective information.

{¶ 11} The charity's board of directors also relied on information supplied by Greene. The board was comprised mainly of friends and family members of Greene, and met infrequently, about twice a year. From 2011 to 2018, the number of board members, aside

5.

from Greene, went from six to three, and Greene served as board president for the entire period at issue in this case. The board approved Greene's activities regarding her use of the charity's property, as well as expenses for repairs and improvements to the residence. The board also approved Greene's management of the charity's funds, based on the information Greene provided. The board was unaware of all the charity's various accounts and credit cards, and unaware of the extent of Greene's reimbursements to herself from the charity's funds. However, the board was aware that Greene took no salary for the work she performed on the charity's behalf, but this was the usual practice begun by Greene's husband and continued by Greene after receiving a small salary in earlier years.

{¶ 12} On the charity's tax filings, Greene reported minimal annual income from the charity in 2011, 2012, and 2013. She reported no income from the charity from 2014 to 2018. Greene also reported no other compensation from the charity, but she resided in the charity's River Road estate and had personal use of the charity's vehicle and other resources throughout the period at issue, 2011-2018. Greene had personal income from social security and worker's compensation, totaling $4,012.74 per month. Greene's monthly expenses, evidenced in part by her credit card spending, exceeded her personal income.

### C. The Investigation

{¶ 13} As early as August 2017, authorities began investigating Greene related to her activities for the charity. Beginning in 2018, a joint criminal investigation was formed to address concerns, including those raised by donors regarding the use of donated funds. The investigation involved resources and personnel of the Wood County Sheriff's Office, the

6.

Wood County Prosecutor's Office, the Bureau of Criminal Investigations (BCI), and the Ohio Attorney General's Office (AG). The Wood County Sheriff's Office received the initial complaints, and they contacted BCI, which is a unit within the AG's office. BCI involved the charitable law section of the AG's office and the county prosecutor in the investigation.

{¶ 14} In 2018, the BCI and the county prosecutor served subpoenas on various banks and credit card companies, seeking financial records. The investigation focused on the disposition of funds raised from before 2011 to the date of the investigation, including significant funds specifically raised for construction of the Hope Center on the property owned by the charity near Levis Commons. Despite donations earmarked for this construction, funds were ultimately directed to the charity's general account and spent, and the charity never broke ground for the Hope Center.

{¶ 15} The joint investigation included subpoenas for financial documents from 14 bank accounts belonging to the charity and Greene. The investigators also reviewed credit card accounts in the name of the charity and Greene. The accounts revealed the following:

### 1. Huntington Bank

{¶ 16} The charity had two accounts at Huntington Bank, a general account (HNB X1571) and a commercial loan account. Based on the investigation, Greene used funds from HNB X1571 to pay non-charity expenses, including payment to an aesthetic spa, payment of over $23,000 to credit cards, and over $5,000 in funds disbursed directly to Greene. The commercial loan account had an original balance of $119.711.20, and the balance at the time of the subpoena was $116,921.58.

7.

## 2. Key Bank

{¶ 17} Both the charity and Greene had several accounts at Key Bank. The charity's accounts included a commercial loan account (X1001), a business gold money market account (X3234), a checking account (X3726), an account for Kids Against Hunger (X5932), an account used for travel (X6526), and an account used for payroll (X6861).

{¶ 18} Greene also had several personal accounts, including a money line account (X0162), a primary and checking account (X1151 and X1153), two MasterCard accounts that were merged in 2018 (X4202/X0714), an additional MasterCard account (X3175), and a money market account (X9667).

{¶ 19} The investigation revealed funds going directly into Greene's personal account (X1151), beyond her monthly income from BWC and Social Security, over the 2011-2018 period, as follows:

| | |
|---|---|
| Cash: | $10,220.18 |
| Misc. checks/refunds: | $ 4,700.24 |
| Reimbursements: | $76,353.13 |
| Transfers: | $32,400.00 |
| Total: | $123,363.55 |

The investigation did not reveal the source of cash deposits noted as amounts exceeding her known income, and the miscellaneous checks and refunds either originated from businesses or appeared to be personal loans from the charity to Greene. All reimbursements originated from a charity account at either Huntington or Key Bank, with no expenditures from Greene's personal accounts to match the $76,353.13 in reimbursements. The transfers

8.

originated from a charity account into Greene's personal checking account (X1153), with no documentation to explain the transfers.

{¶ 20} In addition to the funds directly deposited in Greene's personal account, the investigation revealed that Greene made personal use of the charity's business checking account (X3726). This included over $302,000 in American Express credit card payments, over $26,000 in ATM/withdrawals, over $28,000 in Citibank credit card payments, over $60,000 to Greene, and over $11,000 for animals/pets, including veterinarian care and pet supply purchases.[1]

{¶ 21} The charity's business gold money market account (X3234) had a balance of $52,540.59 in January 2011, but at the time of review in October 2018, the account held only $554.14. Deposits to the account ended in April 2013, and funds were transferred to the charity's checking account (X3726) and used to pay the commercial loan (X1001) in the amount of $7,697.10. Some funds were transferred to the Impact Kids for Hunger account (X5932) and there was a single cash withdrawal by Greene in 2014 in the amount of $200.

{¶ 22} The Impact Kids Against Hunger account (X5932) was reviewed between January 2012 and October 2018, and the deposits and expenses for 2013-2014 were deemed charity-related with no suspicious activity. However, in February 2014, a $5,000 check was written on the account for water damage repairs with no other documentation. A year later,

---

[1] Investigators also noted $1,675.00 paid to Capital One and $3,122.00 paid to Chase Bank, but the investigation revealed no Capital One or Chase Bank accounts for either Greene or the charity. Additionally, the charity paid $43,709.66 to the I.R.S. from its KeyBank (X3726) account, with no record showing the charity owed this amount to the I.R.S.

9.

in February 2015, Greene deposited over $7,000 in the account after Kids Against Hunger held an event named Emma's Build, but investigators found no expenses for a project named Emma's Build. In April 2015, $2,000 was transferred from the Kids Against Hunger account (X5932) to the charity's checking account (X3726), coinciding with a check written to Brondes Ford in the same amount. Then in February 2016, $12,475 was deposited into the Kids Against Hunger account (X5932) after "some type of fundraiser," and shortly after, Greene transferred $18,000 from the Kids Against Hunger account (X5932) to the charity's checking account (X3726). Greene wrote a subsequent check from the Kids Against Hunger account (X5932) for $5,000, noting "mission expense," and transferred $2,500 into the checking account (X3726), with the funds used to pay one of the charity's American Express accounts (X9001).

{¶ 23} Finally, the commercial loan account (X1001) was opened in 2012, and had a balance in November 2018 of over $24,000. The records showed the first draw of $4,000 in 2013, followed by additional advances and transfers into the checking account (X3726), but Greene also used a debit card for the commercial loan account to make purchases at Sam's Club, local grocery stores, Pier 1 Imports, and other local businesses. The investigation could not verify any of the purchases were unrelated to the charity, and did not consider these amounts in the total in calculating misuse of charity funds. Similarly, the investigation found no suspicious activity on the travel account (X6526) and the payroll account (X6861).

10.

### 3. American Express

{¶ 24} The charity had three credit cards with American Express, AMEX 91001, AMEX 81008, and AMEX 71009/72007. Greene also had a personal credit card, AMEX 32003. More than $302,000 was paid by the charity for AMEX 91001 between May 2014 and April 2018, with personal expenses identified that included pet care and personal shopping for clothing, furniture/décor, dietary supplements, personal care, a vacation club/time share, clothing and accessories, and services at a local beauty salon. Greene's personal credit card was used between August 2018 and October 2018, and of the $1,797.33 charged to the account, the charity made payments of $806.58.

### 4. Citibank

{¶ 25} Greene also had seven personal credit card accounts at Citibank. The investigation revealed that Greene made payments to her Citibank credit card accounts from the KeyBank account X3726 in the amount of $28,054.34. Greene also paid $1,950 to Citibank from the Huntington account HNB X1571, for a total of $29,995.34 from a charity account to Greene's personal credit card accounts at CitiBank. Of this total, the investigation identified $5,885.14 as possible charitable expenses. The investigation, therefore, identified $24,110.20 in charity funds used to pay Greene's personal credit card balances at CitiBank.

### 5. PayPal and Blackbaud

{¶ 26} The charity had three PayPal accounts, with funds received in excess of $180,000 beginning in 2005. These funds were deposited in the Huntington account (X1571) or the KeyBank account (X3726), regardless of the donor's designation for funds.

11.

**{¶ 27}** The charity's Blackbaud account received donations from July 2015 until March 2019, with a total of $58,865 donated through the charity's website. Blackbaud did not track donor intent according to the website's menu options, and all funds were deposited in the Keybank account (X3726).

### 6. Loans claimed from Greene

**{¶ 28}** The charity's tax filings for 2011 to 2018 listed loans from Greene to the charity. There was no documentation for any loans. The 2011 filing indicated a loan balance of $286,938, and in the following years Greene claimed loans to the charity as follows: $500 in 2012, $4,750 in 2013, $82,312 in 2014, and $82,312 in 2015. As of 2017, the charity showed a loan balance of $374,500 owed to Greene after noting a 2017 loan from Green to the charity in the amount of $87,562. However, investigators discovered no loan agreement documenting any loan, and the 2017 loan, specifically, could not be matched to any transfer or withdrawal from Greene's personal bank accounts.

### 7. Hope Center Funds

**{¶ 29}** Greene and the charity hosted a gala to raise funds for the Hope Center on February 28, 2013, and funds were deposited into the KeyBank account X3234 during this period. Additional funds were also deposited in other charity accounts around this time. The charity's financial report, posted to the website, showed $416,100 as the current dollar amount for the Hope Center Project. The investigation, however, revealed no funds in either the charity's accounts or Greene's accounts in this amount, as contained within the charity's financial report.

12.

### D. The Investigation's Findings

{¶ 30} Based on the investigation, which focused on a forensic accounting of the various accounts, investigators identified misuse of charity funds by Greene. First, Greene used her access and control of all the charity's accounts to write checks to herself for unverified reimbursements, to make payments on personal credit card debt from the charity's accounts, and to make cash withdrawals from the charity's accounts without documenting the transaction as charity related. Second, Greene used charity credit cards for personal expenses, including spa treatments, pet care, entertainment, food, and clothing/accessories. The investigation determined that Greene treated charity accounts as her own funds and she commingled funds, with many transfers between Greene's personal accounts and the charity's accounts lacking documentation.

{¶ 31} In determining misuse of funds by Greene, the investigation gave Greene the benefit of the doubt as to questionable purchases using the charity's credit cards and only included clearly personal expenditures and direct cash transactions in calculating Greene's personal use. In reaching this determination, the investigation also compared Greene's known income with her personal expenses. In doing so, the investigation focused on Greene's personal expenses, primarily credit card bills, because Greene had no expenses for rent, utilities, or transportation. Greene lived on the charity's River Road property and drove the charity's vehicle, with the charity covering all related expenses for the home and vehicle. Despite eliminating rent and transportation from Greene's expenses, Greene's expenses exceeded her known income. As a result, the additional deposits and transfers to Greene's

13.

account contained within the financial records demonstrated that Greene supplemented her income with charity funds to meet her monthly expenses.

{¶ 32} Greene's use of charity property, moreover, demonstrated that Greene received compensation from the charity. She lived rent-free on the River Road Property, the charity paid for utilities, her phone, and cable, and Greene had free use of the charity's vehicles, maintained by the charity. Greene also benefited from the supplements to her personal income from charity funds. Despite this compensation, Greene represented to donors that she received no compensation from the charity. Greene also represented on the charity's tax filings and in her reports to the charity's board that she received no compensation.

{¶ 33} Greene's failure to maintain documentation, the amounts of money transferred from the charity to Greene, and Greene's monthly personal spending compared to her actual income all established Greene's misuse of the charity's funds. In total, after eliminating all expenses that were conceivably charity-related, and focusing solely on the financial transactions, the investigators concluded that Greene's personal use of charity funds for the period of 2011 to 2018 totaled $440,406.00.

**E. Indictment and Trial**

{¶ 34} On February 18, 2021, the state charged Greene by indictment, alleging one count of tampering with records in violation of R.C. 2913.42(A)(1) and (B)(4), a felony of the third degree; one count of prohibited acts and practices for charities in violation of R.C. 1716.14(A)(5) and 1716.99(A), a misdemeanor of the first degree; one count of solicitation fraud in violation of R.C. 1716.14(A)(1) and 1716.99(B)(4)(d), a felony of the second degree

14.

based on a special finding of elderly victims; and one count of aggravated theft in violation of R.C. 2913.02(A)(2) and (B)(2), a felony of the third degree.[2]

{¶ 35} The matter was tried to a jury beginning August 7, 2023. The state presented evidence demonstrating Greene's control over and use of charity assets, based on examination of the various financial records obtained through subpoena. The state also presented evidence regarding Greene's failure to initiate the Hope Center project, with testimony highlighting Greene's lack of preparation, planning, and efforts to prepare the plans and seek required permits. This failure to take initial steps to begin the project was followed by her fundraising for the project, with all funds raised later disbursed through the charity's general accounts and never spent on the Hope Center as advertised. Finally, the state presented evidence that identified at least two of the Hope Center gala donors as senior citizens at the time of the donation, without objection by Greene, although these individuals were never contacted as part of the investigation and did not testify at trial. The state's case rested primarily on expert testimony, detailing the various financial transactions and identifying expenses that were Greene's personal expenses and not expenses of the charity.

{¶ 36} Greene presented the testimony of Don King, who described his process in completing the charity's annual audits and tax filings. The state objected to testimony addressing King's treatment of Greene's donated services, however, arguing it constituted expert opinion testimony and King had not proffered an expert report pursuant to Crim.R.

---

[2] Additionally, Greene was also charged with telecommunications fraud, but the state dismissed this charge prior to trial.

16(K). The trial court sustained the objection without considering Greene's argument that King testified as a fact witness regarding his own activities. Therefore, King was limited to testimony regarding items he documented in the filings, including existing loans noted from Greene and her late husband to the charity that predated the 2011-2018 period. King relied on Greene for the information he used in his work, and King was unaware of additional charity bank accounts and numerous charity credit card accounts. King acknowledged that Greene found bookkeeping "was a challenge," admitting that Greene was "not really a bookkeeper."

{¶ 37} In addition to King's testimony, Greene presented testimony of a former board member, Jimmy Bramlett, who served on the board with Greene during the 2011-2018 period. Bramlett first met Greene and her late husband on a mission trip to Haiti in 1988. Bramlett is a nurse anesthetist and traveled with the couple on subsequent mission trips before joining the board in 2003. Bramlett testified regarding the necessity of expensive repairs to the River Road property to remedy flood damage, and he also indicated that the cost of maintaining the pool and gazebo at the property was necessary for the charity's purpose as a residence for children receiving medical care and for use in spiritual/religious activities.

{¶ 38} Bramlett also acknowledged that all the recent board members were either family members or family friends, and the board members preapproved expenses by Greene up to $10,000, with Greene the source of all financial information conveyed to the board. Bramlett indicated that Greene received no salary for her work for the charity, but the board

16.

would have approved a salary had she requested one. Bramlett admitted the board was not aware of financial details such as the number of credit card accounts or Greene's reimbursements to herself from charity funds, but the board trusted Greene and approved her expenditures based on the totals provided to the board by Greene.

{¶ 39} Greene's final witnesses were the IT professional who designed the charity's updated website and an attorney who pursued the claim for flood damage to the River Road property. Neither witness had any knowledge of the financial operations of the charity, with testimony limited to the website design and the legal claim between 2006 to 2008, arising from the flood damage. This testimony established that the charity website provided options for donors to target funds but did not otherwise sort the donations into specific accounts, relying on the charity to direct funds to the proper account. The testimony also established that the River Road property sustained water damage caused by nearby construction, with monetary damages recovered to the charity through legal action, prior to the 2011-2018 period.

### F. Jury Instructions

{¶ 40} At the close of the state's case, and again at the close of the defense case, Greene moved for acquittal pursuant to Crim.R. 29. The trial court denied the motions. Prior to submitting the case for deliberation by the jury, Greene requested additional jury instructions on a "claim of right defense," a "good faith defense," and a "mistake of fact defense," arguing she took charity funds under a bona fide belief she was entitled to those funds. Greene also requested an instruction regarding "reliance on an accountant," arguing

17.

she reasonably followed an accountant's advice in good faith after fully disclosing all material facts to the accountant. Greene filed proposed instructions as to the "claim of right defense" and "good faith defense." The trial court denied Greene's request to include her proposed jury instructions.

{¶ 41} The state requested a special finding regarding the elderly victims as part of the jury verdict. Greene did not object to including the special finding in the verdict forms.

{¶ 42} In closing argument, the state highlighted the extensive forensic audit, while focusing on the specific charges. As to tampering with records, the state argued the evidence demonstrated that Greene provided the accountant, King, with inaccurate numbers and information regarding all the charity's bank and credit card accounts and represented to King and donors that she received minimal to no compensation while justifying her use of charity funds and properties as compensation.

{¶ 43} The state further addressed the charges and argued that the evidence demonstrated Greene took funds from the charity's accounts hundreds of times over eight years, totaling over $440,000 and provided incorrect or incomplete records to the charity's accountant, King, and to her board. Additionally, while the board generally approved Greene's actions in managing the charity's funds and operations, the board consisted of friends and family of Greene and there was no real scrutiny of Greene's spending by the board. The state argued that, considering the evidence, Green tampered with records and used charity funds with an intent to deprive the charity of funds in an amount over $150,000,

18.

and Greene's conduct could not be construed as accidental or mistaken, considering the number of transactions, the length of time, and the amounts taken by Greene.

{¶ 44} As to solicitation fraud and prohibited acts and practices, the state argued that Greene planned the Hope Center gala and raised more than $25,000 at the event and about $71,000 total in the following weeks, but Greene demonstrated no intention to proceed with the project and never pursued construction of the Hope Center. Greene also solicited funds through the website, which permitted donors to select a specific use for donated funds, but Greene deposited funds in general accounts with no segregation of funds according to donor designations and used the funds for other purposes, including her personal use. In the case of the Hope Center, Greene quickly spent funds raised for the new building to cover other expenses. Furthernmore, at least two of the Hope Center donors were senior citizens. Funds raised through PayPal and Blackbaud, moreover, were deposited into a general fund rather than specific funds that matched the choices selected by donors on the charity's website. This conduct, the state argued, demonstrated recklessness in committing deceptive acts in soliciting funds for the charity and in committing prohibited acts and practices.

{¶ 45} Greene challenged the state's evidence, arguing the investigation was flawed because only the records were examined, with no inquiry into how the charity operated to better clarify the nature of expenses attributed to Greene as personal expenses. Greene characterized the expert testimony as "guilty until proven innocent," with the expert's determinations shifting the burden of proof by presuming personal expenses in the absence of documentation. Greene further argued that the state was seeking to punish Greene for her

19.

poor bookkeeping skills. Finally, Greene argued that her efforts on behalf of the charity and her uncompensated nursing services demonstrated that Greene lacked the requisite intent to steal from the charity, tamper with records, commit prohibited acts and practices, or commit solicitation fraud.

### G. Verdict and Sentence

{¶ 46} The matter was submitted to the jury, and the jury found Greene guilty of all charges, tampering with records in violation of R.C. 2913.42(A)(1) and (B)(4), a felony of the third degree; prohibited acts and practices for charities in violation of R.C. 1716.14(A)(5) and 1716.99(A), a misdemeanor of the first degree; solicitation fraud in violation of R.C. 1716.14(A)(1) and 1716.99(B)(4)(d), with a special finding of elderly victims, a felony of the second degree; and aggravated theft in violation of R.C. 2913.02(A)(2) and (B)(2), a felony of the third degree.

{¶ 47} On October 20, 2023, the trial court imposed a term of 1 year as to tampering with records, a term of 180 days as to prohibited acts and practices for charities, a term of 3 years for solicitation fraud, and a term of three years for aggravated theft. The trial court ordered the sentences to run concurrently, for an aggregate prison term of 3 years. The trial court imposed no fines or financial sanctions but ordered court costs, stating, "You will have some court costs to pay. The Court will withhold collection on those costs until you're released from custody." The judgment entry stated, "The Defendant is to pay court costs in an amount to be determined," and suspended collection of court costs "until the Defendant is

20.

released from incarceration." The trial court also gave notice of post-release control and ordered restitution to the charity in the amount of $300,000.

{¶ 48} Greene filed a timely appeal of the judgment.

### III. Assignments of Error

{¶ 49} On appeal, Greene argues the following as error:

1. The trial court abused its discretion when it upheld the state's objection against testimony by defense witness King concerning his work preparing the charities 990 tax returns.

2. The trial court abused its discretion when it denied the defense motions for acquittal pursuant to Crim.R. 29.

3. Appellant's convictions were not supported by the manifest weight of the evidence.

4. The trial court abused its discretion when it denied the defense request for jury instructions as to a claim of right defense.

5. The court improperly assigned unspecified court costs to appellant, in an "amount to be determined."

6. Appellant received ineffective assistance of counsel when no expert witness report was obtained for the CPA who prepared the charity's annual tax filings and performed annual audits for the time period at issue.

## IV. Analysis

{¶ 50} In addition to challenging the sufficiency and weight of the evidence, Greene also argues error and ineffective assistance of trial counsel concerning King's proposed testimony, error in rejecting her proposed "claim of right defense" jury instruction, and error in the imposition of an undetermined amount of costs. For ease of discussion, we address some of the assigned errors together.

### A. King's Testimony

{¶ 51} In her first and sixth assignment of error, Greene argues the trial court abused its discretion in precluding King's testimony regarding her compensation, and her trial counsel was constitutionally ineffective in failing to submit an expert report for King, to comply with Crim.R. 16(K).

{¶ 52} At trial, the state objected to any testimony by King that included his opinion, arguing King's opinion constituted expert testimony and Greene had not complied with Crim.R. 16(K), requiring such testimony to be excluded. Greene, however, argued that King was a fact witness. The trial court did not address whether King's proposed testimony was expert testimony and excluded all "opinion" from King based on application of Crim.R. 16(K). Greene did not seek to proffer any testimony following the trial court's ruling.

{¶ 53} We review the trial court's decision, limiting King's testimony, for an abuse of discretion. *State v. Urbanek,* 2023-Ohio-2249, ¶ 62 (6th Dist.), citing *Estate of Johnson v. Randall Smith, Inc.,* 2013-Ohio-1507, ¶ 22 (additional citation omitted.). An abuse of

22.

discretion means the trial court's action was unreasonable, arbitrary, or unconscionable. (Citation omitted) *Estate of Johnson* at ¶ 22.

{¶ 54} The trial court precluded King from presenting his "opinion" to explain his decisions in completing the charity's annual audit and tax filings. The state argued that all such opinion constituted expert testimony, despite Greene's assertion that King was not testifying as an expert. The trial court excluded all opinion testimony without considering whether King's "opinion" could be admitted as lay opinion testimony.

{¶ 55} A witness may provide opinion testimony if "the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. Thus, a lay witness may provide opinion testimony in limited circumstances, based on personal observation and perceptions, even if the witness could otherwise qualify as an expert. (Citations omitted) *State v. Rydarowicz,* 2023-Ohio-916, ¶ 52-56 (7th Dist.). Expert testimony in a criminal case, however, requires compliance with Evid.R. 16(K), with the failure to comply requiring exclusion of expert testimony. *State v. Boaston,* 2020-Ohio-1061, ¶ 54.

{¶ 56} In this case, Greene presented King as a fact witness. The trial court excluded "opinion" testimony from this fact witness because King was trained as an accountant, without first determining whether King's testimony would constitute lay opinion or would, in fact, constitute expert testimony. Because Greene did not seek to introduce King's

23.

proposed testimony by proffer or otherwise, the record permits no resolution of this issue. *See Garrett v. Sandusky,* 68 Ohio St.3d 139, 141 (1994), citing *State v. Grubb,* 28 Ohio St.3d 199 (1986), paragraph two of the syllabus; s*ee also* Evid.R. 103(A)(2). Considering the record, therefore, we find no basis to determine the trial court committed an abuse of discretion by excluding this testimony.

{¶ 57} Greene also argues that her trial counsel was ineffective in failing to submit the expert report required under Crim.R. 16(K). In support, Greene contends there was reliance on King's professional guidance relative to how Greene should file her personal tax return and that they jury should have heard King's testimony relative to Greene's reliance on his opinions of her recordkeeping practices.

{¶ 58} We review claims of ineffective assistance of counsel under the *Strickland* test. *See State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraphs two of the syllabus, citing *Strickland v. Washington,* 466 U.S. 668 (1984). Under *Strickland,* "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *Bradley* at paragraph two of the syllabus, citing *Strickland, supra* (additional citation omitted.).

{¶ 59} Considering the evidence in Greene's case, it is unclear what kind of expert testimony King could have provided. Greene did not proffer King's proposed testimony, and her argument fails to link King's proposed expert testimony to the facts at issue in her case. The state's case relied on expert testimony outlining the findings yielded by a forensic audit

24.

of the charity's and Greene's accounts. King performed annual audits and prepared tax filings using only the information Greene provided him, and King testified that he never conducted a forensic audit but relied on Greene's information. King also acknowledged that Greene did not provide complete information, omitting several of the charity's accounts in her reporting. Furthermore, King did not have access to the charity's day-to-day transactions, and while he knew Greene was a poor bookkeeper, he did not know of Greene's practices of commingling funds or taking funds either through withdrawals, transfers, or reimbursements. King also did not know that Greene failed to keep earmarked funds separated and identifiable.

{¶ 60} Greene's trial counsel had an opportunity to comply with Crim.R. 16(K), after the state sought to preclude King's testimony by motion and the original trial date was continued to a date that would have permitted compliance with the Rule. Instead, Greene's trial counsel insisted at trial that King was testifying as a fact witness and not an expert witness. Based on trial counsel's cross examination of the state's experts, and King's own acknowledgement that he was not a forensic accountant, there is nothing in the record indicating that Greene's trial counsel sought to introduce expert testimony in questioning King. Therefore, there is nothing in the record to support the contention that Greene called King as an expert witness, making Crim.R. 16(K) applicable to the case.

{¶ 61} Based on the record, we construe Greene's argument as challenging her trial counsel's decision not to have her own expert witness to testify in her case. However, it is well-settled that "the failure to call an expert and instead rely on cross-examination does not

25.

constitute ineffective assistance of counsel." *State v. Foust,* 2004-Ohio-7006, ¶ 97, quoting *State v. Nicholas,* 66 Ohio St.3d 431, 436 (1993), citing *State v. Thompson,* 33 Ohio St.3d 1, 10-11 (1987). Instead, reliance on cross-examination in lieu of calling one's own expert has been deemed a legitimate, tactical decision. *State v. Hunter,* 2011-Ohio-6524, ¶ 66, citing *Foust* at ¶ 97.

{¶ 62} Greene's trial counsel did not intend to call King as an expert and King had no demonstrated expertise in forensic accounting. The expert testimony argued by Greene, moreover, does not clearly address a disputed issue in the case. Without a proffer of any proposed testimony, it appears that Greene believes King would have addressed Greene's personal tax returns or Greene's reliance on King's guidance in bookkeeping. However, the prosecution was not about personal tax returns or Greene's failures as a bookkeeper. Instead, the prosecution focused on the forensic audit of the charity's and Greene's financial records that demonstrated Greene used her position and access to take funds from the charity that did not belong to her, and based on the forensic audit, Greene's conduct was not the result of careless bookkeeping, but was instead the result of years of intentional misuse of charity funds.

{¶ 63} Because King was not presented as an expert witness, Crim.R. 16(K) did not apply and trial counsel's decision to forgo a defense expert witness in lieu of cross-examining the state's witnesses was a legitimate, tactical decision. We therefore find Greene's first and sixth assignments of error not well-taken.

26.

### B. Sufficiency and Manifest Weight

**{¶ 64}** In her second and third assignments of error, Greene argues the state presented insufficient evidence of intent to support the charged offenses, and the weight of credible evidence on the issue of intent did not support the jury's verdicts.

**{¶ 65}** "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins,* 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. Sufficiency "is a test of adequacy," or whether there is sufficient evidence on every element of each offense. *Thompkins* at 386-387; *State v. Messenger,* 2022-Ohio-4562, ¶ 13. A conviction resting on insufficient evidence is a denial of due process. *Thompkins* at 386-387; *Messenger* at ¶ 13. We review sufficiency de novo, as a matter of law. *Messenger* at ¶ 13, citing *Thompkins* at 386.

**{¶ 66}** In contrast, a challenge based on the weight of the evidence addresses the state's burden of persuasion. (Citation omitted) *State v. Martin,* 2022-Ohio-4175, ¶ 26, citing *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 19. The weight of the evidence "concerns, 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *Martin* at ¶ 26, quoting *Thompkins* at 387. In a manifest weight review, the appellate court sits as a "thirteenth juror" and considers "the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way." *Thompkins* at 388. The "weight" of the evidence does not refer to the amount of evidence, but rather, whether the

credible evidence is effective "*in inducing belief*" as to the issues the state must demonstrate. (Emphasis sic.) *Thompkins* at 387.

{¶ 67} Greene was convicted on charges of tampering with records, prohibited acts and practices for charities, solicitation fraud, and aggravated theft. We address Greene's argument relative to sufficiency and weight as to each offense in turn.

### 1. Tampering with Records

{¶ 68} Tampering with records in violation of R.C. 2913.42(A)(1) and (B)(4), requires proof of the following:

> (A) No person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following:
> (1) Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record."
> …
> (B) (1) Whoever violates this section is guilty of tampering with records.
> …
> (4) If the writing, data, computer software, or record is kept by or belongs to a local, state, or federal governmental entity, a felony of the third degree. R.C. 2913.42(A)(1) and (B)(4).

{¶ 69} Greene argues there was no evidence of her intent to commit the offense of tampering with records, because the state's evidence merely demonstrated she was a sloppy bookkeeper, with no evidence of her intent or purpose to defraud. The law does not require direct evidence of Greene's intent, however, to sustain a conviction for tampering with records. Instead, intent may be demonstrated by circumstantial evidence, "gathered from all the surrounding facts and circumstances." *State v. Dickerson,* 2023-Ohio-4787, ¶ 46 (8th

28.

Dist.); s*ee also State v. Ndao,* 2017-Ohio-8422, ¶ 17 (2d Dist.) (intent may be inferred from the totality of the circumstances) (additional citations omitted.).

**{¶ 70}** The requisite intent for tampering with records is "purpose to defraud or knowing that the person is facilitating a fraud." R.C. 2913.42(A). "Defraud" is statutorily defined as "knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." *See* R.C. 2913.01(B). Likewise, "deception" is defined as "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another[.]" *See* R.C. 2913.01(A).

**{¶ 71}** Purposely and knowingly are also statutorily defined. A person acts "purposely" when they have a "specific intention to cause a certain result," or when they intend to engage in the conduct that constitutes the offense. *See* R.C. 2901.22(A). A person acts "knowingly" if they are "aware that the person's conduct will probably cause a certain result or will probably be of a certain nature" regardless of their purpose. *See* R.C. 2901.22(B).

**{¶ 72}** At trial, the state presented evidence to demonstrate that Greene provided incomplete information to King, the charity's accountant, for use in preparing the audit and tax filings for the charity each year. In providing this information for the charity's legal filings, Greene represented that she received no compensation and she failed to disclose all the charity's bank accounts and credit card accounts. At the same time, Greene was

29.

personally using the charity's credit card accounts and she was accessing funds from the charity's numerous bank accounts, undetected. Because King did not perform a forensic audit and relied on Greene for correct information, King based his work for the charity on incomplete information and Greene's misuse of funds remained undiscovered. The state's evidence, accordingly, demonstrated more than careless bookkeeping, because Greene had knowledge of these additional accounts, as demonstrated by her use of the accounts, and omitted them from her reporting to King. Additionally, Greene otherwise knew she received compensation, based on her use of the residence, vehicles, *and funds*, but failed to report any compensation or disclose the amount of cash she obtained from charity funds.

{¶ 73} The state, therefore, demonstrated more than errors in Greene's bookkeeping. The state demonstrated that Greene provided false information to King, resulting in inaccurate and misleading annual audits and tax filings, and in doing so prevented King and the charity's board of directors from learning of her personal use of charity accounts. Considering the evidence in a light most favorable to the state, the jury had sufficient evidence to consider whether Greene committed the offense of tampering with records, and the weight of the credible evidence supported the jury's verdict. Simply put, the state presented ample, credible evidence of Greene's purposeful and knowing conduct relative to withholding pertinent information from King that permitted her to continue in that conduct, undetected. Greene's challenge to the sufficiency and weight of the evidence regarding her conviction for tampering with records, accordingly, is without merit.

30.

## 2. Committing Prohibited Acts and Practices and Solicitation Fraud

{¶ 71} Greene next challenges the jury's verdicts for the offenses of committing prohibited acts and practices for charities and solicitation fraud, arguing a lack of evidence of her intent. Prohibited acts and practices, pursuant to R.C. 1716.14(A)(5) and 1716.99(A), requires proof of the following elements:

> The following acts and practices are hereby prohibited and declared unlawful as applied to the planning, conducting, or executing of any solicitation of contributions for a charitable organization or charitable purpose or to the planning, conducting, or executing of a charitable sales promotion:
> …
> (5) Misleading any person in any manner in the belief, or making or using any representation to any person that implies, that the organization on whose behalf a solicitation or charitable sales promotion is being conducted is a charitable organization or that the proceeds of the solicitation or charitable sales promotion will be used for a charitable purpose if either of those is not the fact[.] R.C. 1716.14(A) .
>
> Whoever violates any provision of sections 1716.02 to 1716.17 of the Revised Code… is guilty of a misdemeanor of the first degree. R.C. 1716.99(A).

Solicitation fraud in violation of R.C. 1716.14(A)(1) and 1716.99(B)(4)(d), with the finding of an elderly victim, requires proof of the following:

> The following acts and practices are hereby prohibited and declared unlawful as applied to the planning, conducting, or executing of any solicitation of contributions for a charitable organization or charitable purpose or to the planning, conducting, or executing of a charitable sales promotion:
> (1) Committing any deceptive act or practice; R.C. 1716.14(A).
>
> (4) If the victim of the offense is an elderly person or disabled adult, division (B)(4) of this section and section 2913.61 of the Revised Code apply to solicitation fraud, and solicitation fraud is one of the following:

31.

(d) If the value of the contributions made in the violation is thirty-seven thousand five hundred dollars or more, a felony of the second degree. R.C. 1716.99(B)(4).

{¶ 72} In support of her challenge to the sufficiency and weight of the evidence for these convictions, Greene argues that the state presented no evidence that demonstrated her intent to mislead or commit a deceptive act. Greene argues that neither she nor the board understood the recommended practices for managing the charity's fundraising or its funds, and without knowledge of these practices, her failure to adhere to the practices could not be construed as an intent to mislead.

{¶ 73} Greene argues the intent element is not expressly contained within R.C. 1716.14 in arguing insufficient evidence and challenging the manifest weight of the intent evidence. At least one jurisdiction has considered a violation of R.C. 1716.14 as a statutory offense, with no requirement to demonstrate an intent. *See, e.g., State v. Hargrove,* 2014-Ohio-1919, ¶ 9 (10th Dist.) (unlike a theft offense which requires proof of an intent to purposefully deprive the owner of property, solicitation fraud "only requires commission of a deceptive act while soliciting contributions"). The omission of culpability language, however, requires application of R.C. 2901.21, which provides in pertinent part:

(B) When the language defining an offense does not specify any degree of culpability, and plainly indicates a purpose to impose strict criminal liability for the conduct described in the section, then culpability is not required for a person to be guilty of the offense. The fact that one division of a section plainly indicates a purpose to impose strict liability for an offense defined in that division does not by itself plainly indicate a purpose to impose strict criminal liability for an offense defined in other divisions of the section that do not specify a degree of culpability.

32.

(C)(1) When language defining an element of an offense that is related to knowledge or intent or to which mens rea could fairly be applied neither specifies culpability nor plainly indicates a purpose to impose strict liability, the element of the offense is established only if a person acts recklessly.

R.C. 2901.21(B) and (C). "Recklessness" is defined as "heedless indifference to the consequences," or the disregard of a "substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶ 74} Based on the proceedings, we need not decide whether R.C. 1716.14 is a statutory offense imposing strict liability, or an offense that requires the state to demonstrate recklessness as an element of the offense. At trial, the trial court instructed the jury as to "recklessness" as to these offenses and required the state to prove a reckless mental state in addition to the unlawful conduct. Applying this measure, therefore, we consider whether the evidence of recklessness was sufficient and supported the verdicts.

{¶ 75} Here, the evidence demonstrated that Greene engaged in the prohibited conduct, committing a deceptive act and a separate deceptive act in soliciting funds, and her conduct demonstrated indifference to the results of her actions. The state presented evidence that established the charity invited donors to designate funds for specific purposes, but all funds went to the charity's general fund, with no segregation of funds according to stated donor designations. The evidence clearly showed that Greene made little to no attempt to honor donors' wishes. Greene also advertised that almost all funds went directly to charitable purposes and that she received no compensation to ensure

33.

donor funds had maximum impact, despite the fact she diverted significant funds to her personal use. Finally, Greene posted the charity's annual audit and tax filings to the charity website for donors to view, and due to Greene's withholding of information, these annual filings were inaccurate and misleading.

{¶ 76} As to solicitation fraud, specifically, the state presented evidence that Greene organized and proceeded with fundraising for the Hope Center at the Hope Gala after she stopped pursuing the permitting process, a necessary initial step to proceed with the project. Greene raised about $71,000 for construction of the Hope Center at the gala and in the weeks following, but she quickly diverted all funds to the charity's general account to cover expenses unrelated to the Hope Center. The funds were depleted within two years, and the charity never completed a single permit application to proceed with construction. The state also presented evidence, unchallenged by Greene, demonstrating at least two of the Hope Center donors were senior citizens.

{¶ 77} Construing this evidence most favorably for the state, the state met its initial burden of production as to Greene's reckless mental state in committing offenses under R.C. 1716.14. Additionally, considering the record, we do not find that the jury lost its way in finding Greene's conduct met the standard of recklessness. Greene's challenge based on sufficiency and weight of the evidence as to prohibited acts and practices of a charity and solicitation fraud, therefore, is without merit.

34.

### 3. Aggravated Theft

{¶ 78} Finally, Greene challenges the evidence of intent as to aggravated theft. This offense requires proof of the following:

> (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
> (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
> …
> (B)(2) … If the value of the property or services stolen is one hundred fifty thousand dollars or more and is less than seven hundred fifty thousand dollars, a violation of this section is aggravated theft, a felony of the third degree. …" R.C. 2913.02(A)(2) and (B)(2).

{¶ 79} Greene argues that the state failed to demonstrate she had intent to deprive the charity of any property, because there was evidence that she used credit cards or cash for charity-related expenses and the evidence also demonstrated she provided services to the charity without taking a salary. Additionally, Greene argues that the state failed to prove specific intent because the state presented no direct evidence, but instead relied on spreadsheets of summarized expenses, with "rumor or innuendo" to supply the intent element.

{¶ 80} As an initial matter, the state was not required to demonstrate intent only through direct evidence but could establish intent through circumstantial evidence. "[D]irect evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence. Intent can be proved from underlying facts and circumstances." (Citations omitted) *State v. Jackson,* 57 Ohio St.3d 29, 38 (1991).

35.

{¶ 81} At trial, the state's experts testified regarding the forensic audit along with the "fraud triangle" theory, a theory that explains why people commit fraud. The testimony demonstrated Greene had motivation/incentive, opportunity, and a rationalization, to wit: Greene needed charity funds to meet her personal expenses, which exceeded her personal income; Greene maintained exclusive control over the charity's accounts and used her control to access and otherwise treat the funds as her own; and Greene believed her uncompensated work on behalf of the charity entitled her to the funds. The state presented documentation of Greene's activities, including withdrawing funds or transferring funds directly into her personal account, using charity accounts to make payments on her personal debt, and using charity accounts to make personal purchases. In challenging this evidence, Greene does not dispute the documented activities, but instead, she attempts to *justify* her taking of funds by suggesting the funds were in lieu of a salary or her use of funds to pay personal expenses also provided a benefit to the charity.

{¶ 82} Despite Greene's attempted justification, the record demonstrates both adequate and persuasive evidence of her intent to take charity funds and deprive the charity of these funds. Therefore, it is clear the jury did not lose its way and Greene's challenge to the evidence of intent to commit fraud based on sufficiency and weight of the evidence fails.

36.

**{¶ 83}** Having fully considered the record as to each charge, we find Greene's challenge to evidence of intent based on sufficiency and weight of the evidence without merit. Accordingly, Greene's second and third assignments of error are not well-taken.

## C. Jury Instructions

**{¶ 84}** In her fourth assignment of error, Greene argued that the trial court improperly excluded her requested jury instruction on a "claim of right defense," and alternatively, a "good faith belief defense." Greene argued that these instructions were proper to allow consideration of her specific intent as to offenses involving her record-keeping, reimbursement, and organizational procedures. Greene filed written, proposed jury instructions for these defenses, including a "claim of right" instruction from the Michigan Model Criminal Jury Instructions and a "good faith defense" instruction for fraud offenses from the Sixth Circuit Pattern Jury Instructions.

**{¶ 85}** The state argued against the proposed instructions, contending neither Michigan nor federal law applied to the case. Furthermore, the state argued that the defenses are not recognized under Ohio law. The trial court considered the applicable law, as well as the facts in evidence, and determined the facts in Greene's case did not support including her "claim of right defense" or "good faith belief defense" in the jury charge.

**{¶ 86}** Generally, a trial court's jury instructions must be complete and accurate and must "adequately reflect the issues argued in the case before them." *State v. Vasquez,* 2024-Ohio-860, ¶ 69 (6th Dist.), citing *State v. Sneed,* 63 Ohio St.3d 3, 9 (1992).

37.

"Requested jury instructions should ordinarily be given if they are correct statements of law that are applicable to the facts in the case, and reasonable minds might reach the conclusion sought by the instruction." *Vasquez* at ¶ 69, quoting *Miller v. Defiance Regional Med. Ctr.*, 2007-Ohio-7101, ¶ 40 (6th Dist.) (additional citation omitted.). A court may refuse a proposed instruction if it is inapplicable to the case or incorrect. We review a trial court's decision regarding proposed jury instructions for an abuse of discretion. (Citations omitted) *State v. Hopings,* 2007-Ohio-450, ¶ 35.

{¶ 87} The Michigan and Sixth Circuit pattern instructions address the intent element for theft and fraud. The Michigan pattern instruction provides, in part:

> The defendant does not have to prove [he/she] claimed the right to take the property. Instead the prosecutor must prove beyond a reasonable doubt that the defendant took the property without a good-faith claimed right to do so.

Likewise, the Sixth Circuit instructions states, in part:

> The good faith of the defendant is a complete defense to the charge… because good faith on the part of the defendant is, simply, inconsistent with an intent to defraud….The burden of proving good faith does not rest with the defendant because the defendant does not have any obligation to prove anything in this case. It is the government's burden to prove to you, beyond a reasonable doubt, that the defendant acted with an intent to defraud.

The trial court rejected Greene's proposed instructions, finding the law embodied in the instructions inapplicable to the facts of the case. We agree.

{¶ 88} As a defense unrelated to real property disputes, the "claim of right" defense has limited acceptance under Ohio law. *See, e.g. State v. Snowden,* 7 Ohio App.3d 358 (10th Dist.) (a "mistake of fact" instruction was required where evidence

38.

demonstrated a reasonable belief that the money received belonged to the defendant).

However, in *State v. Griffin,* 2013-Ohio-411 (6th Dist.), we noted this limited acceptance

for peaceful debt collection but also noted that the weight of precedent views the defense

unfavorably. *Griffin* at ¶ 25.

> Among those few Ohio courts addressing the subject, some have rejected
> the doctrine on grounds that public policy abhors lawless reprisal as a
> means of redressing grievances. Thus, in *State v. Sims*, 8th Dist. No. 54278,
> 1988 WL 118581 (Nov. 3, 1988), the defendant, who was caught in the
> commission of a burglary, argued that he was actually trying to "recoup"
> money that had been stolen from him. Rejecting that argument, the court
> succinctly stated, " 'Self-help' replevin is not an affirmative defense to
> burglary." *Id*. at *2. Similarly, in *State v. Padgett*, [2008–Ohio–1166 (2d
> Dist.)], the defendant, who was convicted of robbery, argued that her
> purpose in attempting to take money from a motel cash drawer was not to
> deprive the motel of property as required under R.C. 2913.02(A), but to
> enforce her legitimate claim to a refund. In rejecting the argument, the court
> explained, "In the absence of the voluntary payment of a claim, a person
> making a monetary claim against another is not privileged to seize the other
> person's property to satisfy the claim, but must use legal process to satisfy
> the claim." *Id*. at ¶ 12.

*Griffin* at ¶ 24.

{¶ 89} Greene's "claim of right" or good faith defense rests on her claim of

uncompensated services, negating any intent to take charity funds. Greene's reliance on

the defense, however, asserts the same "self-help" conduct that has been rejected as a

defense to theft offenses. As we noted in *Griffin,* the facts in Greene's case did not

demonstrate "a peaceful or unopposed attempt to recover money believed to have been

stolen" and Greene, having informed her board she would not take a salary, was not an

"actual creditor or claimant" to the property. *See Griffin* at ¶ 27 (finding the taking of

39.

property without acknowledgement is not debt collection for purposes of a good faith belief defense).

{¶ 90} Based on this record, there was no evidence to demonstrate a good faith belief or claim of right relative to Greene's conduct. The trial court, accordingly, did not err in refusing to provide Greene's proposed jury instructions. We find Greene's fourth assignment of error not well-taken.

### D. Court Costs

{¶ 91} In her fifth assignment of error, Greene argues the trial court failed to properly impose costs by not specifying the specific costs imposed. As a result, Greene argues that the trial court could only impose the mandatory costs of prosecution by identifying only "court costs" at sentencing and in the judgment.

{¶ 92} As we have previously noted, "Court costs, costs, or costs of this action means any costs that the Revised Code requires a court to impose upon an offender who has been convicted." *State v. Lieb,* 2023-Ohio-574, ¶ 7 (6th Dist.), citing *State v. Bricker*, 2022-Ohio-3494, ¶ 25 (6th Dist.), quoting *State v. Lantz*, 2019-Ohio-3307, ¶ 11(6th Dist.). These mandatory costs, pursuant to R.C. 2947.23(A)(1), are the costs of prosecution, imposed without regard to the defendant's ability to pay. *Lieb* at ¶ 8. In contrast, non-mandatory costs, such as the costs of confinement, require a determination of the defendant's ability to pay and must be separately imposed at the sentencing hearing and in the judgment. *State v. Patterson,* 2024-Ohio-2198, ¶ 13 (6th Dist.).

40.

**{¶ 93}** Greene concedes that the trial court imposed costs of prosecution, mandatory costs under R.C. 2947.23. Greene identifies no other costs imposed by the trial court, as the record contains no separate determination regarding non-mandatory costs either at sentencing or in the judgment entry. Considering the record, therefore, we find no error by the trial court in imposing court costs, which are the mandatory costs under R.C. 2947.23. Greene's fifth assignment of error, therefore, is not well-taken.

## V. Conclusion

**{¶ 94}** For the foregoing reasons, the judgment of the Wood County Court of Common Pleas is affirmed. Appellant, Linda Greene, is ordered to pay the costs of the appeal pursuant to App.R. 24.

Judgement affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.

_____

Gene A. Zmuda, J.
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

41.